AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of South Carolina

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) Case No. 2:19-cr-671 |
| **208 Louie Lane, Ladson, South Carolina** | ) ) ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A

located in the _____ District of _____ South Carolina _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841 | PWID Controlled Substance |
| 21 USC 846 | Conspiracy |

The application is based on these facts:
See Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Brian Robinson, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: July 23, 2019          _____
*Judge's signature*

City and state: Charleston, South Carolina          Bristow Marchant, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER AUTHORIZING A DOCUMENTARY SEARCH WARRANT FOR THE RESIDENCES LOCATED AT: | ) ) ) ) ) | MISC NO.  2:19-cr-671 |
| **234 Miami Street, Lot 20, Ladson, SC** | ) | **UNDER SEAL** |
| **208 Louie Lane, Ladson, SC** | ) | |
| **10825 Dorchester Road, Apt 2028, Summerville,  SC** | ) | |
| **162 Jenkins Road, Yemassee, SC** | ) | |
| **409 Lafayette Road, Holly Hill, SC** | ) | |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR SEARCH WARRANTS

I, BRIAN ROBINSON, a Special Agent with Homeland Security Investigations (HSI), being duly sworn, declare and state:

1.      I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7)—that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I have been a Special Agent with U.S. Customs/HSI since February 2003 and am currently assigned to the Drug Enforcement Administration (DEA) Task Force in Charleston, South Carolina. Prior to my employment with HSI, I was employed as a law enforcement officer in Cobb County, Georgia, for over three years and was assigned to the Marietta/Cobb/Smyrna Narcotics Task Force (MCS Narcotics) for more than two years. While with MCS Narcotics, I conducted and/or participated in numerous drug and money laundering related investigations. Since being assigned to the HSI Charleston office, I have primarily conducted investigations involving the illegal importation and distribution of drugs, and weapon and money laundering violations and, among other things, have conducted or participated in surveillance, the execution of search warrants,

debriefings of informants, reviews of recorded conversations, and have conducted or participated in investigations that included the interception of electronic communications. I have written and submitted to the Court numerous affidavits in support of arrest warrants, search warrants, pen registers, Title-III wire intercepts, and electronic tracking device (ETD) warrants. I have served as the lead case agent during numerous wiretap investigations. I have received additional training in these investigations from the DEA, Internal Revenue Service (IRS), and other federal and state government agencies. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of drug proceeds, and the terminology and coded language used by drug traffickers.

2.      While involved in investigations involving drug trafficking and criminal enterprises, I have communicated extensively with other federal, state, and local law enforcement personnel who specialize or have expertise in this area. Based on my training, experience, and participation in drug trafficking investigations, I know that:

a)      Drug traffickers must maintain at ready access large amounts of cash in order to maintain and finance their ongoing drug business;

b)      Because drug trafficking on the scale revealed in this investigation is frequently a continuing activity which spans many years, because the traffickers inventory of controlled substances fluctuates depending on availability and demand, and because drug traffickers commonly front drugs, or provide them on consignment to their customers, the traffickers must maintain books, receipts, notes, ledgers or some other type of record reflecting such transactions. Drug traffickers and members of criminal enterprises must keep their records in some secure, yet readily accessible, place where they can be used and maintained, such

2



as in homes, offices, places of business, automobiles, safes or safe deposit boxes. Drug traffickers and members of criminal enterprises must keep these records of their illegal activities beyond the time during which controlled substances are actually in their possession, so that they can maintain contact with their criminal associates for future drug transactions, and so that they can keep records of prior transactions for which they might be owed or owe inventory or money;

c)    Drug traffickers and members of criminal enterprises commonly hide controlled substances, drug proceeds, and records of their drug transactions in secure locations, as well as in offices or places of business, automobiles, garages, or storage buildings. Similarly, the traffickers and members of criminal enterprises have ready access to these items, and attempt to conceal them from law enforcement agencies;

d)    Drug traffickers and members of criminal enterprises often conceal controlled substances, currency, financial instruments, documents relating to financial transactions, precious metals, jewelry, other items of value, and proceeds of drug transactions, all of which constitutes evidence of drug trafficking activities. Additionally, such items constitute evidence of transactions establishing the generation, transfer, concealment, and expenditure of large sums of money made from trafficking in controlled substances.  Drug traffickers maintain these items in secure, yet convenient locations, such as their homes, offices, and places of business, garages, storage buildings, automobiles, and safe deposit boxes;

e)    Drug traffickers and members of criminal enterprises commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses, and telephone numbers for their drug trafficking and money laundering associates.

3

These items are sometimes in code;

f)      Drug traffickers and members of criminal enterprises frequently have photographs and video of themselves, their associates, their property, firearms, and controlled substances, which are usually maintained in their homes, offices and place of business. Such photographs and videos constitute evidence of their drug trafficking and criminal activities, establishing their connections with items of property with each other, and with drugs and firearms;

g)      Drug traffickers and members of criminal enterprises involved in importation or transportation of controlled substances from source cities generally possess documentation, such as telephone records, correspondence, shipping receipts, wire transfers, airline ticket receipts, and the like, which pertain to the acquisition, transportation, shipment, or receipt of, or payment for, controlled substances, which is evidence of the traffickers' participation in the illegal drug scheme;

h)      Drug traffickers and members of criminal enterprises often maintain some record of the movement of money, whether it is accomplished by wire or interbank transfer or by a person acting as a courier. Such records, even though they may be in code, are evidence of the traffickers and/or the criminal enterprise member's illegal activities;

i)      Drug traffickers and members of criminal enterprises often use false or fictitious names or corporations or other business entities to launder their drug proceeds and to send shipments of cash or controlled substances through the mail or other delivery services. Banks, both domestic and abroad, are sometimes utilized by traffickers or their agents though which proceeds from their illegal

activities are laundered. Funds are frequently transferred between banks and various accounts to conceal their sources and origins.   It is also common to obtain bearer or other negotiable instruments through foreign banks to avoid the necessity of filing currency transaction reports, in this manner concealing the fact of the transaction and the true ownership of the funds. Documents or records of any kind reflecting any connection with any such entity or transaction constitute evidence of the traffickers participation in the illegal scheme;

j)      Drug traffickers and members of criminal enterprises frequently utilize a continuing pattern of activities to launder and conceal drug-generated proceeds and assets, which lasts over a period of years.   Drug traffickers use these patterns or schemes to create the appearance of legitimate income so that they can eventually convert the proceeds or assets to themselves or to a nominee under their control.   In this way, the traffickers and members of criminal enterprises can enjoy and use their properties while attempting to conceal their illegal activities, which generated the proceeds or assets;

k)      Courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, which includes trafficking in controlled substances and illegal schemes to conceal drug-generated proceeds;

l)      Drug traffickers and members of criminal enterprises who deal in illegal controlled substances often use cellular telephones to maintain contact with and receive phone and or text messages from their customers, suppliers, and co-conspirators to further their drug distribution activity;

m)      Drug traffickers and members of criminal enterprises often possess and maintain firearms, ammunition and bulletproof vests in their homes to protect their

5



drugs and illegal proceeds. The firearms and ammunition are used in violation of Title 18, United States Code, Section 924(c) and are considered tools of the drug trade; and

n)    In addition, during the course of such residential searches, I have also found items of personal property and or mail that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises

## BASIS FOR FACTS CONTAINED IN THIS AFFIDAVIT

3.    Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was either obtained by me personally or provided by a law enforcement officer, who may have had either direct or hearsay knowledge of the statement, to whom I have spoken, or whose report(s) I have reviewed. Similarly, except where otherwise indicated, information resulting from surveillance does not always set forth my personal observations, but rather those observations provided directly or indirectly by, and/or through other special agents and task force officers of DEA or other law enforcement officers who conducted such surveillance. Because this affidavit is submitted for the limited purpose of showing probable cause, I have not set forth each and every fact learned during the course of this investigation. Facts not set forth herein are not being relied upon in reaching my conclusion that the facts provided establish probable cause.

## PURPOSE OF AFFIDAVIT

4.    This Affidavit is being submitted in support of an Application by the United States of America, which seeks search warrants for the following residences described in Attachment A:

      **234 Miami Street, Lot 20, Ladson, SC**
      **208 Louie Lane, Ladson, SC**
      **10825 Dorchester Road, Apt 2028, Summerville, SC**
      **162 Jenkins Road, Yemassee, SC**
      **409 Lafayette, Holly Hill, SC**

6



## THE DRUG TRAFFICKING ORGANIZATION

5.    Since September 2016, the Drug Enforcement Administration (DEA), Homeland Security Investigations (HSI), United States Postal Inspection Service (USPIS), the Charleston County Sheriff's Office (CCSO), North Charleston Police Department and the Beaufort County Sheriff's Office (BCSO) have been involved in the investigation of a drug trafficking organization (DTO) operating in the low country of South Carolina. Based on investigative efforts including statements from confidential sources (CSs), cooperating defendants (CDs), and the interception of TARGET TELEPHONE 3 used by Carlton EDWARDS, the interception of TARGET TELEPHONE 4 used by Keith CHISHOLM, the interception of TARGET TELEPHONE 11 used by Michael HUBBART as well as the interception of a telephone used by David ECCLESTON, I have learned that Carlton EDWARDS receives cocaine, heroin and marijuana from David ECCLESTON, a/k/a "the General," and Diane ELLIS and others unknown and utilizes Wayland PARKER and Michael HUBBART to receive the drug laden parcels through their employment with the United States Postal Service (USPS) and FedEx. Michael HUBBART, Matthew JAMES, Joe JEFFERSON, Keith CHISHOLM, FNU LNU a/k/a "Dread" and others then distribute the drugs in South Carolina.

## ARREST AND INTERVIEW OF COOPERATING DEFENDANT

6.    On August 29, 2018, CCSO arrested a suspect in North Charleston, South Carolina known to be associated with the residence located at 2133 Victory Avenue, North Charleston, SC.[1] During the lawful traffic stop, the suspect was found in possession of 4 ounces of crack cocaine

---

1 Based on analysis of the parcel activity conducted by the DTO, USPIS identified the residence at 2133 Victory Avenue in North Charleston, SC as receiving multiple parcels suspected to contain drugs. On January 31, 2018, law enforcement established surveillance at 2133 Victory Avenue in North Charleston, SC in anticipation of a suspected drug parcel arriving via USPS.   Based on surveillance and criminal conduct that transpired, a search warrant was obtained and executed. Items discovered within the residence included 62 grams of cocaine, 26 grams of heroin, 124 grams of cocaine cut and 140 grams of marijuana. Also found within the residence were 2 pistols, a shotgun and a rifle in addition to scales and packaging material and documents indicating that CD-3 was involved in the distribution of drugs from the residence.



and a firearm. After being advised of Miranda rights, the suspect agreed to cooperate with law enforcement and through a series of interviews provided detailed information concerning the DTO. The suspect, hereinafter referred to as a Cooperating Defendant (CD-3),2 provided the following information:

a) CD-3 stated that 2133 Victory Avenue in North Charleston, SC was a "trap" house used by the DTO to distribute narcotics. CD-3 described that an old, black man that goes by the name "Pops" is a leader in the DTO that is supplying the area with approximately 30 kilograms of cocaine and approximately 80-100 pounds of marijuana each month. CD-3 explained that "Pops" used 2133 Victory Avenue and other addresses to receive USPS parcels containing drugs and then "Pops" organizes the distribution of those drugs. CD-3 stated after that the search warrant at 2133 Victory Avenue, "Pops" changed the addresses used on the drug-laden parcels. CD-3 described that "Pops" uses houses in the Russeldale area, specifically residences located on Jonah Street and Celestial Court in North Charleston to receive drug-laden parcels.

b) CD-3 met "Pops" in January 2018, through BLAKE. BLAKE met "Pops" through his (BLAKE's) mother who was an employee at a hotel that "Pops" would use to facilitate the drug distribution. CD-3 described that BLAKE's mother would always tell "Pops" about her son and, as a result "Pops," now calls BLAKE "son."

---

2 CD-3 has been convicted possession of marijuana (2009), driving under suspension / seatbelt violation / speeding (2012), possession of marijuana (2012), driving under suspension / speeding (2016). CD-3 has pending state charges. Information provided by CD-3 has been corroborated through subpoenas, court orders, other co-defendants, and a confidential source, and thus, has been deemed credible. For example, CD-3 did not have access to discovery or other means of knowing what information law enforcement had possession of at the time of his arrest, yet CD-3 provided specific details of events that law enforcement had already either participated in or observed on surveillance. Furthermore, CD-3 provided names and telephone numbers of members of the DTO, which were later corroborated through subpoenas, pen registers, and surveillance. CD-3's motivation for cooperating is judicial consideration.

CD-3 described "Pops" as a black male with a Jamaican accent, 50-60 years of age, short hair, and some type of scar underneath his eye. "Pops" is married to "Diane," and they have residences in South Carolina, Florida, and California. CCSO detectives recognized the description of "Pops" as EDWARDS. Agents presented an unmarked photograph of Carlton EDWARDS to CD-3, who observed the photograph and identified EDWARDS as "Pops." Agents presented an unmarked photograph of BLAKE to CD-3, who observed the photograph and identified BLAKE. Agents presented an unmarked photograph of ELLIS to CD-3, who observed the photograph and identified ELLIS as EDWARDS's wife, who CD-3 referred to as "Diane."

c) CD-3 stated that EDWARDS stays at an apartment complex on Ingleside Boulevard in Ladson, SC in apartment number 4401₃. CD-3 described the apartment as a location used to store and distribute drugs. CD-3 stated that drugs are transported to the apartment after they are delivered in USPS parcels to various addresses in the Russeldale area. The parcels are stored at the apartment based on whom they are destined for or what they contain.

d) CD-3 described that he/she once had a close relationship with EDWARDS because the two had lived together for a brief time. CD-3 stated that EDWARDS's wife, ELLIS, lives in California and assists the organization with sending the drugs from California to South Carolina. CD-3 stated that the drugs are transported through the USPS and FedEx. CD-3 stated that EDWARDS has someone that works for the USPS and someone that works for FedEx. CD-3

---

3 Agents have identified the apartment and gathered an extensive amount of evidence corroborated CD-3's statement, however EDWARDS did not renew the lease of the apartment which expired in late 2018. Agents believe the seizures of drugs and drug proceeds forced the DTO to change their tactics.

described that EDWARDS pays the corrupt USPS and FedEx employees to make sure that the packages arrive at locations determined by EDWARDS. CD-3 stated that EDWARDS directs where the drugs will be sent and decides which parcels go to each distributor. EDWARDS pays several hundred dollars for an address or name to be used as the address destination for drug-laden parcels. However, often the parcel will not even arrive at the listed address before the USPS carrier meets EDWARDS or EDWARDS directs someone to meet the USPS carrier to obtain the parcel(s).

e)  CD-3 described the corrupt USPS employee as a short, heavy-set black male with short hair. Agents presented an unmarked photograph of PARKER to CD-3, who observed the photograph and identified PARKER as the corrupt USPS carrier diverting drug-laden parcels at the direction of EDWARDS. CD-3 did not know PARKER's name.

f)  CD-3 described the FedEx employee as a black male, skinny, approximately six feet tall, long dreads, braces, and noted he drives a silver Chevrolet Impala. Agents presented an unmarked photograph of HUBBART to CD-3, who observed the photograph and identified HUBBART as the FedEx employee working with EDWARDS. CD-3 only knows HUBBART as "FD Boy" or "FedEx Boy."

g)  CD-3 stated that the DTO's operation extends all over South Carolina and into other states. CD-3 stated that EDWARDS has directed drug-laden parcels to North Carolina, Georgia, Florida, and Texas.

h)  CD-3 stated that a black male from Beaufort, South Carolina is the largest distributor of cocaine supplied by EDWARDS. CD-3 described that the "Beaufort guy" as dark skinned, tall, and skinny. CD-3 stated that the "Beaufort guy" travels

10



to Charleston, South Carolina to drop off money and to receive cocaine from EDWARDS. CD-3 has observed the "Beaufort guy" driving a Lexus sedan. Agents presented an unmarked photograph of CHISHOLM to the CD, who observed the photograph and identified CHISHOLM as the "Beaufort guy."

i)   CD-3 stated that a subject known to him as "Joe" from Summerville is involved as well. CD-3 described "Joe" as a heavy set, black male with a scruffy beard. CD-3 stated that "Joe" and EDWARDS met each other while they were in prison. CD-3 stated that "Joe" has family that lives on Jonah Street in North Charleston and that is where EDWARDS acquired the area addresses listed on the parcels containing drugs. CD also admitted that "Joe" supplied the crack cocaine seized from CD-3 during the traffic stop on August 29, 2018. Agents presented an unmarked photograph of JEFFERSON to CD-3, who observed the photograph and identified JEFFERSON as the distributor CD-3 referred to as "Joe."

j)   CD-3 was asked to describe the leader of the DTO. CD-3 stated that EDWARDS is responsible for the operation in South Carolina. CD-3 stated that either CHISHOLM or JEFFERSON would probably be the next person underneath EDWARDS and that HUBBART would be next in the hierarchy. CD-3 was asked why he/she thinks those two are the next two people underneath EDWARDS. CD-3 explained that it is because JEFFERSON and HUBBART have a key to the apartment on Ingleside Boulevard and can access the apartment whenever they want. CD-3 stated that EDWARDS and another co-conspirator also have a key to the apartment. CD-3 stated that HUBBART has a key because EDWARDS has directed HUBBART to transport parcels to the apartment once they arrive at addresses in North Charleston, South Carolina.

11



k)    CD-3 described that only marijuana and cocaine are handled by EDWARDS. CD-3 stated that EDWARDS only transports parcels that have arrived which contain either marijuana or cocaine to the Ingleside Boulevard apartment. CD-3 explained that if a distributor requested any drug other than marijuana or cocaine, EDWARDS will arrange for the parcel containing the drugs to be sent to either a vacant house or those specific person(s) who ordered the specific drug would pick up the parcel directly from where PARKER, the corrupt USPS carrier, arranges to meet along his USPS route. CD-3 explained that the parcels that contain other drugs are not transported to the Ingleside Boulevard apartment. CD-3 stated that the other drugs being distributed consist of heroin (possibly fentanyl), methamphetamine and ecstasy.

l)    CD-3 was asked how EDWARDS transports the proceeds from the distribution of the drugs. CD-3 stated that the money is placed in the back of suitcases. CD-3 described that inside the suitcases, the back liner zips down and there is a back panel inside the liner. CD-3 stated that EDWARDS takes the screws out of the back panel, removes the panel, and lays the money out flat across the back of the suitcases. The back panel is then re-installed with screws and glue to conceal the money, and the liner is zipped back over the panel.

m)    CD-3 stated that once the money is concealed within the suitcase, a courier travels with the suitcase via commercial airline. CD-3 explained that the only way that money is sent through the mail, FedEx, bank deposits or by money remitting service is if there is an issue and someone in the organization needs money quickly.

n)    CD-3 admitted that in the past, he/she has assisted EDWARDS loading suitcases

12



with drug proceeds to be sent to California.

o)    CD-3 admitted that he/she has picked up/received drug laden USPS parcels from PARKER at the direction of EDWARDS on multiple occasions. CD-3 described that he/she would meet PARKER on his route and receive several parcels at a time from PARKER in his USPS vehicle. EDWARDS then instructed CD-3 to transport the parcels to the apartment on Ingleside Boulevard. After building EDWARDS's trust, CD-3 was asked to transport suitcases with money concealed within to Los Angeles, California. EDWARDS paid CD-3 $800 and paid for CD-3's travel expenses.

p)    CD-3 stated that EDWARDS provided cash, and CD-3 purchased the airfare with a personal credit/debit card. After arriving in Los Angeles, California, CD-3 met with a light skinned black male with a Jamaican accent outside of a Holiday Inn near LAX. CD-3 stated that the subject he/she met is known as "the General." "The General" provided CD-3 a key to a room in the hotel, and "the General" took the suitcases where the drug proceeds were concealed from CD-3. Later on the same night, "the General" returned to the hotel and returned the suitcases to CD-3 before CD-3 traveled back to Charleston, South Carolina the following day. CD-3 advised CCSO that the airline confirmation ticket and number are on CD-3's cellular telephones.4 Agents presented an unmarked photograph of ECCLESTON to CD-3, who observed the photograph and identified ECCLESTON as the subject to whom CD-3 had delivered the suitcases containing the money in Los Angeles, California and that CD-3 referred to as "the

---

4 A consensual review of CD-3's telephone revealed a confirmation for CD-3's travel to Los Angeles International Airport (LAX) in February 2018.



General."

q)    CD-3 met EDWARDS's niece, Kerice CHATRIE-BONNEY at the Best Western

located at 747 Treeland Drive, Ladson, SC5  When CD-3 arrived at the hotel,

CHATRIE-BONNEY and CHISHOLM were together in the room. CD-3 acquired

a kilogram of cocaine and CD-3, CHATRIE-BONNEY, and CHISHOLM walked

out of the room together. CD-3 explained to CHATRIE-BONNEY that he/she

would need to pick up an additional kilogram of cocaine in the days following.

CD-3 was instructed to contact CHISHOLM to acquire the additional kilogram of

cocaine. Within a day or two, CD-3 recalled calling CHISHOLM in an attempt to

acquire the additional kilogram; however, CD-3 was not able to acquire the

additional kilogram before CD-3 was arrested. EDWARDS "fronted" a portion of

the kilogram of cocaine, and CD-3 still owes EDWARDS $16,000 for it.

## TITLE III INVESTIGATION

7.    On October 12, 2018, the Honorable Judge Margaret B. Seymour, United States

District Judge, District of South Carolina, authorized the interception of wire and electronic

communications occurring over telephone number 843-974-7533 (TARGET TELEPHONE 2) and

telephone number 347-984-4754 (TARGET TELEPHONE 3), both used by EDWARDS.

Monitoring was initiated on October 12, 2018, and was terminated on October 23, 2018. During

the intercepted communications, EDWARDS was actively involved in the distribution of cocaine

and marijuana from California to South Carolina to HUBBART, JAMES, JEFFERSON,

CHISHOLM and FNU LNU a/k/a "Dread."

8.    On December 7, 2018, the Honorable Margaret B. Seymour, United States District

---

5  A consensual review of CD-3's telephone revealed a search for the address "747 Treeland Drive, Ladson, SC"
listed in the "Recent Searches" of a map application.



Judge, District of South Carolina, authorized the interception of wire and electronic communications occurring over telephone number 843-408-1542 (TARGET TELEPHONE 4), used by Keith CHISHOLM.   Monitoring was initiated on December 7, 2018 and was terminated on January 5, 2019. During the intercepted communications, EDWARDS was actively involved in the distribution of cocaine and marijuana from California to South Carolina to HUBBART, JAMES, JEFFERSON, CHISHOLM and FNU LNU a/k/a "Dread."

9.    On January 10, 2019, the Honorable Dale S. Fisher, United States District Judge, Central District of California, authorized the interception of wire and electronic communications occurring over telephone number 562-479-4890, used by ECCLESTON.   Monitoring was initiated on January 14, 2019, and was terminated on February 12, 2019. During the intercepted communications, ECCLESTON and EDWARDS were actively involved in the distribution of cocaine and marijuana from California to South Carolina to HUBBART, JAMES, JEFFERSON, CHISHOLM and FNU LNU a/k/a "Dread."

10.    On February 13, 2019, the Honorable Dale S. Fisher, United States District Judge, Central District of California, authorized the continued interception of wire and electronic communications occurring over telephone number 562-479-4890, used by ECCLESTON. Monitoring was initiated on February 13, 2019, and was terminated on March 14, 2019. During the intercepted communications, ECCLESTON and EDWARDS were actively involved in the distribution of cocaine and marijuana from California to South Carolina to HUBBART, JAMES, JEFFERSON, CHISHOLM and FNU LNU a/k/a "Dread."

11.    On June 4, 2019, the Honorable Margaret B. Seymour, United States District Judge, District of South Carolina, authorized the interception of wire and electronic communications occurring over telephone number 843-300-8851 (TARGET TELEPHONE 11), used by Michael HUBBART.   Monitoring was initiated on June 5, 2019 and was terminated on July 4, 2019.



During the intercepted communications, ECCLESTON and EDWARDS were actively involved in the distribution of cocaine, heroin and marijuana from California to South Carolina to HUBBART, JAMES, JEFFERSON, CHISHOLM and FNU LNU a/k/a "Dread."

## LOCATIONS TO BE SEARCHED

### 234 MIAMI STREET LOT 20, LADSON, SC

12.     **234 Miami Street Lot 20, Ladson, SC** is the residence of Michael HUBBART, a/k/a "FD Boy," a/k/a "fedex," a/k/a "Jason Benjamin." During the interception of TARGET TELEPHONE 11, an analysis of the geo-location indicated that HUBBART was living at 7004 S. Kenwood Dr., North Charleston, SC and was using the address to distribute drugs and store drug proceeds and documents related to his drug trafficking and the DTO. Intercepted communications of HUBBART, using TARGET TELEPHONE 11 indicated that HUBBART and his girlfriend Shamonique Taylor moved from 7004 S Kenwood Dr, North Charleston, SC to **234 Miami Street Lot 20, Ladson, SC** over a period of time in late June 2019 completing the move by the beginning of July 2019. A query of the South Carolina Department of Motor Vehicles revealed that both HUBBART and Taylor's driver licenses still list their previous address at 7004 S. Kenwood Dr, North Charleston, SC.   A subpoena to Berkeley Electric Cooperative account information as of July 22, 2019 revealed Shamonique Taylor as the subscriber for utilities, with an open and active account at **234 Miami Street Lot 20, Ladson, SC** with service established on July 2, 2019. Additionally, the account listed a phone number for Shamonique Taylor as 843-806-9621, which has been intercepted numerous times over TARGET TELEPHONE 11 and the user identified as Shamonique Taylor who lives with HUBBART and is pregnant with HUBBART's children (twin boys). During the intercepted communications of TARGET TELEPHONE 3 used by EDWARDS, TARGET TELEPHONE 4 used by CHISHOLM, TARGET TELEPHONE 11 used by HUBBART and the interception of a telephone used by ECCLESTON in the Central District of California,

16



HUBBART discussed both drug trafficking and the movements of drug proceeds.

13.    On October 14, 2018, at approximately 9:16 p.m., EDWARDS, using TARGET TELEPHONE 3, received an incoming call from HUBBART, using TARGET TELEPHONE 11. The following is a transcript of the intercepted conversation:

> EDWARDS: Hey
> HUBBART: What's up dude?
> EDWARDS: Everything good?
> HUBBART: Alright, alright.   Keith had tell me to call you?
> EDWARDS: Who?
> HUBBART: I said Keith had tell me to call you?
> EDWARDS: Yeah yeah. But I tell him, in the morning, U/I I tell him to tell you to holler at me. U/I. But listen my man, this week gonna be crazy. So stay on point.   My word is my bond.
> HUBBART: I got you. I gotta go get...
> EDWARDS: Tomorrow when you get off, just come and see me.
> HUBBART: Alright, I'm about to go pick up the rest of that ice cream.
> EDWARDS: Uh, ok. Take everything up there.
> HUBBART: I took that last one, that one I had got on Thursday.
> EDWARDS: Yeah.
> HUBBART: The one I got Friday, I took that one. And then I bout to get the one that I got from yesterday, bout to go get the rest of that money right now.
> EDWARDS: Oh okay, well I'm up by the house.
> HUBBART: Alright.
> EDWARDS: You put it in the same place right?
> HUBBART: Yeah, yeah yeah. It's right there.   I put the change right there inside your arm rest on the couch.
> EDWARDS: Alright.   How much money I take?
> HUBBART: That's um, that's 31-5 for that last one.
> EDWARDS: Ok. What about the loud?
> HUBBART: Yeah, I got that right there in my hand.
> EDWARDS: Alright.   Don't say no more. Look here, I got a lot of shit for you this week. I know Thanksgiving coming up.
> HUBBART: Right, right.
> EDWARDS: I show you how I'm gonna stock up on everything.   What about the boys U/I they don't want no cheap stuff?
> HUBBART: Um, I can ask them boys.   I gotta go see them right now matter of fact. Go pick up that money.
> EDWARDS: Ask them.
> HUBBART: Alright.
> EDWARDS: Alright.[6]

---

[6] Based on the intercepted communication, my experience in this case and my training, I believe that EDWARDS directed Keith CHISHOLM to tell HUBBART to call EDWARDS when CHISHOLM and HUBBART were meeting or communicating. HUBBART explains to EDWARDS that he is going to get the rest of the ice cream (identified by CD-3 as cocaine), and he put $31,500 in drug proceeds in the arm rest of EDWARDS's couch. EDWARDS asked about the "loud," referring to high grade marijuana, and HUBBART acknowledges that he

17



14.    On June 8, 2019 at approximately 8:15 p.m., HUBBART, using TARGET TELEPHONE 11, received an incoming call from 843-806-9621, a telephone used by Shamonique TAYLOR. The following is a transcript of the intercepted conversation:

> HUBBART: What?
> TAYLOR: What the hell you got going on? Be safe.
> HUBBART: Oh yeah, I am.
> TAYLOR: You going somewhere far?
> HUBBART: No.
> TAYLOR: You got your gun?
> HUBBART: Oh yeah, I got three in my car.
> TAYLOR: That's good, have one every corner where you can reach it. Don't let nobody sit behind you.
> HUBBART: No.
> TAYLOR: Alright, love you.[7]

15.    On June 15, 2019 at approximately 1:39 p.m., HUBBART, using TARGET TELEPHONE 11, made an outgoing call to 843-224-2642, a telephone used by Jamaal GETHERS. The following is a transcript of the intercepted conversation:

> GETHERS:  Yo!
> HUBBART:   This man just tell me; if you mix mine and mix yours together you can make that bitch go for three bands.
> GETHERS:  U/I
> HUBBART:  Huh?
> GETHERS:  What happened now?
> HUBBART: The man said you mix mine, and you mix yours together that bitch will go for three to three-five a grip... and them boys can still touch it.
> GETHERS:  I'll call you right back.   Answer the phone.
> HUBBART:  Alright, damn nigga, like sit down and talk to dog. Like I said, I still got a whole cake.   Ya feel what I'm saying?
> GETHERS:  Right.
> HUBBART:   I just ain't touch it yet, 'cause I ain't tryin' to let people know I on deck. I'm tryin' to act like its coming sporadically.   So I still got a whole cake.
> GETHERS:  So you saying you gonna band, put 'em together?
> HUBBART:   The shit with that my nigga, I can still get Joe on it, see if you can get him down to 5-0 or 4-5 right?

---

already has that. EDWARDS explains that he is going to "stock up on everything" referring to multiple types of drugs.

7 Based on the intercepted communication and intercepted communications before and after, my experience in this case and my training, I believe that HUBBART was conducting drug transactions and TAYLOR was concerned for his safety. HUBBART had departed his residence and explained to TAYLOR that he was in possession of firearms for protection.



GETHERS:  Right

HUBBART:  I can still bring that to 6 and we can split that 6, you see what I'm saying we can split that to 15 or in that you feel me.

GETHERS:  Right, alright, say 4-5? Or lower?

HUBBART:  No, if he do 4-5, or 50. Yeah. I say if we do 4-5, that's 15 we can split together.   Or if he do 50, then that's 10 we can split together.   Ya feel me?

GETHERS: Alright.

HUBBART:  And like I said, the nigga, the next person, he gonna run back, he gonna run back every day.

GETHERS: Yeah.   Damn nigga u/i, so the shit you got is the shit you been telling me about?

HUBBART:  That's the white one, that's the one Drew telling me got, and it's going for 18.

GETHERS: You put em together...

HUBBART:  You put em together, and you got a whole fuckin happy birthday. You see what I'm saying?

GETHERS:  Yeah right, right.   We need to sit down and talk then and handle it.   I going back to the house now.

HUBBART:  Like I say, he ain't tested it.  He just smelled it and everything.  He about to give it to the tester now, so whenever that shit happen, I'll let you know, but that's just off a looking at the thing cause I tell him, I say I back on deck with mine, this just for other people.   And he's like shit.   If you on deck and he on deck...Them boy come together, you know?

GETHERS:  I already know I u/i too big ..I don't know nothing about that shit.

HUBBART:  I'm about to say I can still offer them together, I still can do 120 on that bitch.   I can still do 120 and make big person one that's gonna pay 120.   Because I'm telling you, my ticket right there is 4-5 on mine, you know what I'm saying, on my cake, is 4-5.   And I put them boys at 60 every time, I done sell three of them shit. So you look at the math, you see what I'm saying?   Last month alone, I sold two. This month I sold one.

GETHERS:  Right.

HUBBART:  That why them boys trying to get at me, I tell them boy I u/i shit, them niggas getting taxed 22, and I ain't playing.   They wanna run to you and talk "tax me 18," man fuck that nigga.

GETHERS:  Man

HUBBART:  Cause they want yours and they want mine...cause they gonna put it together, they gonna take over...they put they money together.   They building off you to come and run to me.   You see what I'm saying?

GETHERS: Right.

HUBBART:  Cause they know they can do with mine.

GETHERS: Right

HUBBART:  They just gonna try to eat off both of us and take that shit across there to where they back pumping the tree and fucking up the number again, that's all they trying to do. That what I say.   Before you do any fucking thing, man....know

GETHERS:  Ahh..

HUBBART:  That why I just wanna figure out what the fuck is up when that shit went down.   The first day when you came out...

19



> GETHERS:   Well we sit down and talk U/I
> HUBBART: Alright.[8]

16.     On June 20, 2019 at approximately 4:00 p.m., HUBBART, using TARGET TELEPHONE 11, received a text message from 843-806-9621, a telephone used by Shamonique TAYLOR. The following text message was intercepted:

> Do you have the guns?[9]

17.     On June 20, 2019 at approximately 5:37 p.m., HUBBART, using TARGET TELEPHONE 11, placed an outgoing call to 940-0332, a telephone used by Anttwon HAYNES. The following is a transcript of the intercepted conversation:

> HAYNES: Hello?
> HUBBART: You still alright?
> HAYNES: Yeah, I'm about to damn, I washing my hands and shit now.
> HUBBART: Hmm. I trying to tell you um, I think this is a pack of two. I try and tell you come grab them shit. I think it's a pack of two. Look like one, it's small enough.
> HAYNES: What's that?
> HUBBART: This bag.
> HAYNES: You say you think it's a package.
> HUBBART: A pack of two, like two in a pack.
> HAYNES: Yeah yeah yeah yeah.
> HUBBART: You can grab this shit.
> HAYNES: Where you at?
> HUBBART: At my spot.
> HAYNES: Alright I'm about to pull up.
> HUBBART: Alright.[10]

18.     On June 27, 2019 at approximately 5:37 p.m., HUBBART, using TARGET TELEPHONE 11, placed an outgoing call to 928-529-9844, a telephone used by Carlton EDWARDS. The following is a transcript of the intercepted conversation:

---

8 Based on the intercepted communication, my experience in this case and my training, I believe that HUBBART and Jamaal GETHERS are discussing the purchase, mixing and sale of kilogram quantities of heroin.
9 Based on the intercepted communication, my experience in this case and my training, I believe that TAYLOR was asking if HUBBART had guns with him. Prior intercepted communications indicated that TAYLOR and HUBBART were in the process of moving from 7004 S Kenwood Dr., North Charleston, SC to **234 Miami Street Lot 20, Ladson, SC**.
10 Based on the intercepted communication, my experience in this case and my training, I believe that HUBBART was inspecting packages of drugs that arrived that day via FedEx and HUBBART transported to his residence. HUBBART is informing HAYNES to come pick the drugs up. Geo-location information for TARGET TELEPHONE 11 was at HUBBART's residence, where HUBBART described to HAYNES where he was located.



EDWARDS: What's up?

HUBBART: Hey Joe.

EDWARDS: Yeah.

HUBBART: You know General can get his hands on some of that black, um, big boy?

EDWARDS: Black one?

HUBBART: Yeah the black tar, the black tar one.

EDWARDS: We used to get the black tar and they say they never want it.

HUBBART: I, see, see, the guy who be getting the, the one off me now . He said his partner want it. And his partner is will to pay, um, 20 for it.   You know what I'm saying?

EDWARDS: 20?!

HUBBART: Yeah, 20 for it. He willing pay, yeah 20.

EDWARDS: *Laughing* I don't know. The General can get in front of that. l don't know. Because we don't deal in that shit. Man (U/I)

HUBBART: Alright.

EDWARDS: The black tar?

HUBBART: Yeah the black tar. Yeah yeah the black tar, uh big boy. You know what I'm saying, dog food, yeah.

EDWARDS: Yeah, yeah, yeah, yeah I gotta ask him.

HUBBART: Alright.

EDWARDS: (U/I) ask him, ya know?

HUBBART: Alright.

EDWARDS: Ask him.

HUBBART: Yeah he called me…

EDWARDS: Uh huh.

HUBBART: Yeah he called me, he said probably by next weekend. He'll be calling me about that other one too. You know what I'm saying. He'll be calling me for one.

EDWARDS: Yeah, yeah. But they should never (U/I) like that.

HUBBART: Oh yeah. No no. He'll…

EDWARDS: You get off?

HUBBART: No, I'm not off yet. I'm still doing these delivery route right now.

EDWARDS: Okay.

HUBBART: When I get off, I'm just gonna go get the money orders but…

EDWARDS: Yeah. I just sent (U/I) family and then once (U/I) call and tell him that you got 3 (U/I). You hear?

HUBBART: I got you. I just text him too.

EDWARDS: Yeah and tell him send the rest and I'll call Monday.

HUBBART: Alright.

EDWARDS: They don't want to get this off to him and tell him set up (U/I) gonna come tomorrow.

HUBBART: I got you.

EDWARDS: Because he have to get the information. Eh?

HUBBART: With this extra box right, what am I doing with this one? I mean what am I doing with this box?

EDWARDS: Remember. Listen to this now right.

21



HUBBART: Yeah.

EDWARDS: It's (U/I) got 4, right?

HUBBART: Right, right.

EDWARDS: That's eleven. Right?

HUBBART: Right.

EDWARDS: Take two from eleven. Nine.

HUBBART: Uh huh.

EDWARDS: You give Dread two, three. What that leave? Six.

HUBBART: Right.

EDWARDS: Right?

HUBBART: Yeah.

EDWARDS: What are you up to now? (U/I) time Family send information. You go over there and you drop off two to him.

HUBBART: I got you.

EDWARDS: But you want to drop off one of the gelato, one of the platinum.

HUBBART: I got you. Alright.

EDWARDS: So that's gonna be, (U/I). That's gonna be, two. Two for you, two for Jonah, that's four. And the uh, that's four platinum, two for you, two for (U/I), one gelato for Joe, right?

HUBBART: Right.

EDWARDS: So it's gonna leave 3. It's gonna leave, 3 platinum. Right?

HUBBART: Right.

EDWARDS: One platinum for Family, one of the gelato.

HUBBART: Got you.

EDWARDS: The (U/I) sell that shit. (U/I) sell it for 24. Right?

HUBBART: Right.

EDWARDS: They gonna ask for (U/I). Take the four (U/I)

HUBBART: I got you.

EDWARDS: Take the 2 platinum and the 2 gelato up there and get the rest of that money.

HUBBART: Alright.

EDWARDS: And they stopped that.

HUBBART: And you say, you say he had owed 19 on the rest. Right?

EDWARDS: He owe 9 on, it might be 8 thousand.

HUBBART: Yeah. Oh he owe 900. Right?

EDWARDS: 900 no. He owe me 9. He owe me one thousand two hundred.

HUBBART: Okay.

EDWARDS: (U/I) One thousand two hundred he have to give me. Well when you go up there, you just call me.

HUBBART: I got you.

EDWARDS: I'll see if he can give us some more money.

HUBBART: Alright.

EDWARDS: (U/I) Two gelatos and two of the platinum up there.

HUBBART: I got you, ok.

EDWARDS: And then (U/I) and family get one gelato and platinum. Joe get two platinum, one gelato, and you get your two straight up platinum.

HUBBART: Got you.



EDWARDS: So everything good now right?

HUBBART: Yeah, yeah.

EDWARDS: Look here. Just if money orders (U/I) ten dollars just buy the money orders and make the boy get the 8 thousand (U/I) the dread. You can put the ten dollars and everything. (U/I)

HUBBART: Alright.

EDWARDS: Send the orders to me.

HUBBART: Alright.

EDWARDS: Make Dread give you extra money.

HUBBART: I got you. Okay.

EDWARDS: I'm gonna make him give you extra money so you go up there. Okay?

HUBBART: Alright.

EDWARDS: Alright.[11]

19.     On June 29, 2019 at approximately 9:55 a.m., HUBBART, using TARGET TELEPHONE 11, received an incoming call from 843-974-7206, a telephone used by Wayland PARKER. The following is a transcript of the intercepted conversation:

HUBBART: What's up man?

PARKER: Ain't nothing. Whats going on with you?

HUBBART: Ain't nothing, everything good?

PARKER: Huh?

HUBBART: I said everything good?

PARKER:   Yeah everything good. I just got up out the office, um...

HUBBART: I got you um you remember the other dude... um the little short black one with the dreads?

PARKER: Short black one with the dread?

HUBBART: Yeah, I think he called you one time before. I think he got a 305 area code.

PARKER: ummm maybe maybe

HUBBART: He got gold teeth in his mouth not the light skin one but he got gold teeth in his mouth kinda short he usually be driving a white SUV or a Black SUV with rims on it.

PARKER: Oh the BMW.

HUBBART: mmHmm yea the BMW yea um yea He told me to tell you not to answer his phone calls no more I guess he cutting him off and what not so if he call don't even call him.

PARKER: Yeah, I just heard I just got the text from Miss D.

HUBBART: I got you I got you but yea just let me know whenever you ready man.

PARKER: Yeah, I mean I'm ready whenever you are.

HUBBART: Ok I'm gonna leave from where I'm at now and head over to you. You in

11 Based on the intercepted communication, my experience in this case and my training, I believe that HUBBART was asking EDWARDS to acquire a specific type of heroin from ECCLESTON. Agents believe that the conversation then shifted to marijuana and EDWARDS directing HUBBART as to who gets what type of marijuana and how much as well as the collection of drug proceeds, referring to JEFFERSON, JAMES and FNU LNU a/k/a "Dread."



your same area?
PARKER: Huh?
HUBBART: You in the same area?
PARKER: Yeah, um, I still gotta do Rivers right now um what part of where you at right now what area you at right now.
HUBBART: I'm at um I'm at FedEx right now you know right over here by the Burger King, Anfield.
PARKER: Ok so you ain't to far. You know where JD Byryder at?
HUBBART: Yeah.
PARKER: I'll do that back area right there.12

20.    On June 30, 2019 at approximately 10:29 a.m., HUBBART, using TARGET TELEPHONE 11, placed an outgoing call to 843-224-2642, a telephone used by Jamaal GETHERS. The following is a transcript of the intercepted conversation:

GETHERS:  Hello?
HUBBART: What's going on man?
GETHERS:  Man, this nigga say he hope I catch diarrhea, bro.
HUBBART: Say what?
GETHERS:  This nigga say, he hope I catch diarrhea. Cause my dog chew his fishing rod up. Whats up, whats going on?
HUBBART:  Ain't shit, damn I been saying um, I got that other shit your peoples been looking for man.
GETHERS:  What that?
HUBBART:  That dirt.
GETHERS:  Oh, the girl?
HUBBART:  Yeah.
GETHERS:  What the ticket is?
HUBBART:  Man them boys, I'll go nine five for the singles. You know what I'm saying. I just need 34 to be honest. Know what I'm saying?
GETHERS: 34 for the whole thing?
HUBBART Yeah for the whole thing. But if I can just single that bitch out, I mean...
GETHERS:  Nine five?
HUBBART Yeah, nine five for the singles, yeah and just do the math on em from up there...
GETHERS:  Let me figure it out real quick.
HUBBART Alright.

---

12 Based on the intercepted communication, my experience in this case and my training, I believe that HUBBART was arranging to meet PARKER to receive a USPS parcel that contained 2 kilograms of cocaine that had been arranged by EDWARDS and supplied and shipped by ECCLESTON. Agents confirmed that PARKER was working that day and was assigned the area that he described. Agents also located the parcel, which was addressed to a location on PARKER's route and shipped from JNC Shipping Office Supplies, 8013 Archibald Ave, Rancho Cucamonga, CA. As described below, intercepted communications corroborated PARKER had passed the drug laden parcel to HUBBART and EDWARDS later arranged for HUBBART to deliver 1 kilogram to JAMES who then sold the kilogram of cocaine for $33,000. In this intercepted communication, I believe that HUBBART was also passing information to PARKER that EDWARDS did not want PARKER to meet with JAMES anymore.



GETHERS: Alright.13

21.    On July 1, 2019 at approximately 9:31 p.m., HUBBART, using TARGET
TELEPHONE 11, placed an outgoing call to 843-701-6453, a telephone used by Dante HUBBART.
The following is a transcript of the intercepted conversation:

>     Dante HUBBART: Who dis?
>     HUBBART: What's happening with you?
>     Dante HUBBART: Man chilling, what you got going on. You done finished?
>     HUBBART: A little bit, little bit. I got a little bit left.
>     Dante HUBBART: I got to holler at you about that other thing.
>     HUBBART: Right, you talking about pressing it?
>     Dante HUBBART: Huh?
>     HUBBART: Right, you talking about pressing it?
>     Dante HUBBART: No, what you got going on.
>     HUBBART: That's what I'm talking about. Oh you talking about getting some.
>     Dante HUBBART: Yeah getting some.
>     HUBBART: Yeah, what's happening?
>     Dante HUBBART: Let me get one.
>     HUBBART: A single?
>     Dante HUBBART: Huh?
>     HUBBART: You said a single?
>     Dante HUBBART: Yeah.
>     HUBBART: Um, you talking about tonight?
>     Dante HUBBART: Where you at?
>     HUBBART: I at my spot, but…
>     Dante HUBBART: I gotta come there?
>     HUBBART: Yeah.
>     Dante HUBBART: Alright, I coming.14

22.    On July 2, 2019 at approximately 5:07 p.m., HUBBART, using TARGET
TELEPHONE 11, placed an outgoing call to 855-739-7887, the telephone number for Comcast a
cable, internet and telephone provider. Comcast identified HUBBART's home address as 7004 S

---

13 Based on the intercepted communication, my experience in this case and my training, I believe that HUBBART
had received the 2 kilograms of cocaine from PARKER and was offering to sell a quantity to GETHERS. I believe
that GETHERS referred to the cocaine as "the girl," a common street name for cocaine, because HUBBART and
GETHERS primarily conduct drug transactions involving heroin, which is commonly referred to by the street name
of "boy." I believe that HUBBART offered GETHERS a kilogram of cocaine for $34,000 and quarter kilogram
amounts for $9,500 each.
14 Based on the intercepted communication, my experience in this case and my training, I believe that Dante
HUBBART was asking for cocaine from HUBBART. HUBBART referred to "pressing it," when criminals combine
cocaine with a cutting agent and then use a fabricated press to create more product to sell. I believe that this
intercepted communication was about one of the kilograms of cocaine that HUBBART received from PARKER on
June 29, 2019. HUBBART told Dante HUBBART to come to his residence to get the cocaine.

25



Kennwood Dr, North Charleston, SC. HUBBART then spoke to a Comcast representative to process a change of service address because HUBBART had moved. HUBBART provided his new address as at **234 Miami Street Lot 20, Ladson, SC** and because the residence was new and service had never been established there HUBBART provided a description of where the residence is located.

23.    On July 9, 2019, United States Magistrate Judge Bristow Marchant, District of South Carolina, authorized a warrant for the geo-location information of TARGET TELEPHONE 11 and TARGET TELEPHONE 18, both used by HUBBART, for a period of 30 days. On this same date, DEA began receiving geo-location information of TARGET TELEPHONE 11 and TARGET TELEPHONE 18.

24.    On July 11, 2019 HUBBART was indicted by a federal grand jury in Charleston, South Carolina for violations of Title 21, USC 841, 843 and 846 and Title 18, USC 2.

25.    An analysis of the geo-location data for TARGET TELEPHONE 11 and TARGET TELEPHONE 18 indicates that since moving to **234 Miami Street Lot 20, Ladson, SC**, HUBBART spends a considerable amount of time at **234 Miami Street Lot 20, Ladson, SC**, including extended time through the night.

26.    Based on the intercepted communications, confidential sources and cooperating defendants, physical surveillance as well as my experience in this case and my training, I believe HUBBART is exploiting his position as a FedEx carrier to receive drugs for the DTO and also distributing drugs for the DTO and evidence of HUBBART's participation with the DTO will be found at **234 Miami Street Lot 20, Ladson, SC**. I also believe that HUBBART uses **234 Miami Street Lot 20, Ladson, SC** to conceal records of his criminal activity because HUBBART is a large scale distributor for the DTO. I believe HUBBART uses **234 Miami Street Lot 20, Ladson, SC** to primarily store drugs and as such books, records, receipts, notes, ledgers and other papers



relating to the cost of, and profits from, ordering, purchasing, transporting and distributing drugs, in particular heroin, cocaine and marijuana will be found there.  I believe HUBBART resides at **234 Miami Street Lot 20, Ladson, SC**, and as such based upon my training and experience, I believe that drug proceeds as well as records, receipts, ledgers and other documents or records relating to the shipment transportation or delivery of U.S. currency, drug-related proceeds or assets by wire, courier or other means will be found there. I believe that at indicia of occupancy, residency, rental and /or ownership of **234 Miami Street Lot 20, Ladson, SC** or of any vehicles or other conveyances; including, but not limited to, utility and telephone bills, cancelled envelopes, rental, purchase or lease agreements, titles, registration documents, and keys as well as the telephones used by HUBBART and intercepted during this investigation, to include TARGET TELEPHONE 11 and TARGET TELEPHONE 18 will be found at **234 Miami Street Lot 20, Ladson, SC**. Additionally, based specifically upon several intercepted conversations, I believe HUBBART stores firearms and ammunition, as well as papers, documents, records and/or receipts pertaining to the possession or ownership of firearms and ammunition at **234 Miami Street Lot 20, Ladson, SC** [reference paragraphs 14 and 16].

### 208 LOUIE LANE, LADSON, SC

27.    **208 Louie Lane, Ladson, SC** is the residence of Matthew JAMES, a/k/a "Family." A query of the South Carolina Department of Motor Vehicles revealed that JAMES provided his address for his driver license as **208 Louie Lane, Ladson, SC**.   A subpoena to Dominion Energy requesting account information as of July 22, 2019 revealed JAMES as the subscriber for utilities, with an open and active account at **208 Louie Lane, Ladson, SC** with service established in March 2017. Additionally, the account listed an email of tashawnabroughton@ymail.com, which is the name listed on the rental vehicle that JAMES used to pick EDWARDS up from the Charleston International Airport on July 9, 2019 [reference paragraph 106]. During the intercepted

communications of TARGET TELEPHONE 3 used by EDWARDS, TARGET TELEPHONE 11 used by HUBBART and the interception of a telephone used by ECCLESTON in the Central District of California, JAMES discussed both drug trafficking and the movements of drug proceeds.

28.    On October 15, 2018 at approximately 1:00 p.m., EDWARDS, using TARGET TELEPHONE 3, made an outgoing call to JAMES. The following is a transcript of the intercepted communication:

> JAMES:  Hello?  Hello?
> EDWARDS:  Yeah what time you gonna get off?
> JAMES:  Four o'clock.
> EDWARDS:  Four o'clock?
> JAMES:  Yeah.
> EDWARDS:  How far are you from here?
> JAMES:  Fifteen minutes when I get off.
> EDWARDS:  Oh ok.  Um, our boy is gonna come here.  I gonna make him the address. I wanna send those money fedex overnight to Cali.
> JAMES:  Alright.
> EDWARDS:  Alright

29.    At approximately 4:45 p.m. that same day, EDWARDS, using TARGET TELEPHONE 3, received an incoming call from JAMES. The following is a transcript of the intercepted communication:

> EDWARDS: Yo! At Joe.
> JAMES: Yo, where you at general?
> EDWARDS: Down at Joe.
> JAMES: Huh?
> EDWARDS: I'm at Joe house.
> JAMES: Down or up?
> EDWARDS: At Joes house, please come and see me. All time down the road.
> JAMES: Alright.
> EDWARDS: Down at Joe's house, Joe's house right here (U/I)
> JAMES: Alright.
> EDWARDS: Right at Coopers. Swing by there. I right here waiting.



30.     At approximately 7:16 p.m. that evening, EDWARDS, using TARGET TELEPHONE 3, received an incoming call from JAMES. The following is a transcript of the intercepted communication:

> JAMES: I just opened up that loud and there is four in there not five.
> EDWARDS: I know that, I know that, I told you that, there is four or five Family. I didn't tell you five.
> JAMES: Ok. I gotta let you know though.
> EDWARDS: Yeah, just that's protocol, but I ain't gonna lie to you. That's why I give it to you, if I didn't trust ya.
> JAMES: Alright, and I aint gonna lie, and I aint gonna lie to you. Thats why I call and let you know.
> EDWARDS: If I didn't trust ya, I wouldn't have deal you like that, cause only certain people operate that way.

31.     On October 19, 2018 at approximately 9:28 a.m., EDWARDS, using TARGET TELEPHONE 3, received an incoming call from JAMES. The following is a transcript of the intercepted communication:

> EDWARDS: The X youth have a thing for you. Hear?
> JAMES: Huh?
> EDWARDS: Hello?
> JAMES: Yo!
> EDWARDS: The X youth have a thing for you. So you can link him up later. Ok? And get it on your lunch break.
> JAMES: From who?
> EDWARDS: The X boy!
> JAMES: Alright. alright. alright.
> EDWARDS: The X boy, (UI) the X man. Him have 3 bags of corn for you...and one of your things.
> JAMES: Alright.
> EDWARDS: Just get that, you'll get everything sooner but surely is what (UI).
> JAMES: Alright.
> EDWARDS: So just call him, you got his number?
> JAMES: No.
> EDWARDS: I gonna give you his number. That's gonna be important 'cause I can't make you wait on something what you don't got no number. I gotta give you communication thats how I operate. I gonna give you his number now, just give me a minute. Just give me a minute, Family. Alright you ready?
> JAMES: Yeah.
> EDWARDS: 843-300-8851. IM that. Call him.
> JAMES: 300-8851
> EDWARDS: Yes sir. Call him and line up with him.



JAMES:   Alright, check this out.
EDWARDS: Yes sir?
JAMES: You think I can get a low play on the corn this time?
EDWARDS: Look here, ain't nothing for no corn out there old man. Ain't nothing around, ain't nothing around my man! Look here, listen to me my man!
JAMES: Alright, Yo?
EDWARDS: I save these for you. I only got those, nothing more not gonna come in until November, the middle of November.
JAMES: Well I ain't gonna rush it because I got to be able to get me some money, you know what I'm saying? So I ain't gonna rush it. I gonna do what I gotta do.
EDWARDS: Listen me, Listen me, anytime that shit. . . Listen for a sec my man. Anytime this shit come in flowing, you know what I do.
JAMES: Yeah I know.
EDWARDS: Listen me, I say Family right? So if you see me say certain things, it's for a reason. 'Cause I don't give nobody leverage like what I give you. For real, for real.
JAMES: I already know that.
EDWARDS: Listen me Family. You know me! I don't railroad no mother fucker for no chump change, I'm like that.
JAMES: I catch you the other day when you tell me you gonna get my shit when you around the next man with money. I listen to you, I be following you. You don't put nobody on what you do for me. I follow you.
EDWARDS: Alright, you ain't gotta say no more. You ant gotta say no more, you say it all.
JAMES: Alright.
EDWARDS: Call that number and hook up with the man. Ok?
JAMES: Alright.
EDWARDS: I got you, alright.[15]

32.    On October 20, 2018 at approximately 9:04 a.m., EDWARDS, using TARGET

TELEPHONE 3, received an incoming call from JAMES. The following is a transcript of the

intercepted communication:

JAMES: What's up man?
EDWARDS: You tell me. What's up?
JAMES: You up top?
EDWARDS: Huh?
JAMES: I say you up top?
EDWARDS: No sir. What happen?
JAMES: I am trying to get you this money.
EDWARDS: For what? Tell me.
JAMES: Shit, that money I owe you.
EDWARDS: Look here, what you owe me? I am not stressing about money and what you owe me. I want to know what you coming to me with. 'cause you are family.

---

15 Based on intercepted communication, my experience in this case and my training, I believe the term "corn" which is also described as "popcorn" is used by the DTO to refer to marijuana.



JAMES: Man, I got 31,000, man.

EDWARDS: For what?

JAMES: Shit I trying to put another one on top of the rest of that shit.

EDWARDS: Which one?

JAMES: And got dam pay you your money.

EDWARDS: Alright tell me what you gonna do. Family, tell me what you gonna do right now.

JAMES: I trying to put another one on top of the other three and then I got the five that I owe you.

EDWARDS: How much you owe me total? Before we talk about the money.

JAMES: I owe you 7,200 for loud.

EDWARDS: Right, sir.

JAMES: And 5,000 for that girl. Remember I had owe you 5,000.

EDWARDS: I know what you owe me, family. Look here, one thing about you and money...I gonna tell you about you and money now. U/I you're money might look a bit short, but you are.   No one can't fool you with money one thing people don't like you with money   here what happen now you home right now give me about 10:30   or 11:00 I will come to you or make you come to me.

JAMES:   I at home right now, I ain 't going no where now. Question, question.

EDWARDS: Something will come in this week, family. Something will come in this week.

JAMES: That ain't what I ask you about, I ain't asking you about that. How much I can get the loud for?

EDWARDS: Over there right now is not the season right now. Over there you don't know the regular price until it come in.

JAMES: The regular price is what?

EDWARDS: You know what the regular price I always give ya for family. Your price is family price. Why you going to put me through that, I never you a dollar more than what I tell you at all times. No for real. I'm like that.

JAMES: Alright then, say no more.

EDWARDS: Look here, you're going to pay me for the loud that you had got, right?

JAMES: Man just role on me man.

EDWARDS: No man cause I got loud for you so I want to know.

JAMES: Yea I sell them thing for 18 and it gonna take longer to sell that shit right now because I going to have to charge them boys more being that you say regular price you know what I am saying. I wanted to try to buy me one or two just to buy...

EDWARDS: Look here me, like I tell you family I do it to you for fun. I don't need money from my family, listen to me if you want loud money. Listen to me, I buy a lot. I buy a lot, like I buy a hundred pounds, I get it for about fifteen and a half or 1,525. So if listen to me now so if you want me to buy about four or three for you   just give me the money and I'll get it for you I don't have a problem with you.

JAMES: Call me when you get up top.

EDWARDS: Look here let me ask you a question, what you ask me to do and I never do for you?

JAMES: I can't say nothing. I tell you like you tell me you got me on that one. I can't...

EDWARDS: I never turn you down. Let me tell you something, let me tell you how I operate with you. I don't lie to you and I don't have to prove nothing to you.



JAMES: Right
EDWARDS: Let me tell you something, I get five birds right?
JAMES: Right.
EDWARDS:   I owe Joe something, I owe X man something and I owe the Fed Ex one.
You know what I do, I don't take nothing. I give you one, I give the FedEx boy one, and I
give Joe.   And that's it! I don't need nothing because I know my one coming this week.
I'm not gonna sweat what I know is for sure. You know what I sweat? What I want to try
to do. What I want to make happen. What I control, have patience because here what
happen now, my loyalty is what U/I. I don't need nothing from nobody.[16]

33.      In late February 2019 based on intercepted communications of ECCLESTON's

telephone, agents seized four parcels at the FedEx hub located in Memphis, TN that were shipped

from JNC Shipping Office Supplies, 8013 Archibald Ave, Rancho Cucamonga, CA on February

25, 2019 addressed to four separate locations in North Charleston, SC on HUBBART's assigned

FedEx delivery route. The intercepted communications revealed that one parcel of drugs was sent

for JAMES and the other 3 parcels of drugs were sent for HUBBART to distribute. Specifically,

before the four parcels were shipped on February 25, 2019 JAMES sent ECCLESTON a text

message that read "4209 kelly st unit A N Chas sc 29405 mya white."[17] On February 26, 2019,

during an intercepted communication, EDWARDS told ECCLESTON that the "X-man," referring

to HUBBART, had said that the "boogie man held the things from that side of the road." A short

time later on February 26, 2019, ECCLESTON called EDWARDS and said that he had seen it that

morning and saw that it was in Memphis. EDWARDS said he told HUBBART that the greatest

thing was no one was in trouble and not going to anybody and the one person that was in trouble

was JAMES. EDWARDS said if it goes to that point because his [JAMES] thing was a straight

thing so they [law enforcement] can go and talk to people. ECCLESTON acknowledged.

EDWARDS said with the other 3 they [law enforcement] cannot go and talk to anyone.

---

16 Based on intercepted communication, my experience in this case and my training, I believe the term "birds" is
slang for a kilogram of cocaine.
17 Through intercepted communications of TARGET TELEPHONE 11 and surveillance, agents identified 4209
Kelly St, Unit A, North Charleston, SC as a "trap house" that JAMES uses to receive and distribute drugs.



34.     On March 1, 2019, search warrants were issued in United States District Court, District of South Carolina for the four parcels. Upon executing the search warrants, agents discovered each parcel contained an identical box built of "luan" plywood. Agents opened each of the plywood boxes and found packing peanuts and bricks of cocaine taped together with brown packing tape. Parcel # 1 addressed to "Mya White, 4209 Kelly Street Unit A, North Charleston, SC 29405" contained 2 kilograms of cocaine destined for JAMES while Parcel # 2, # 3 and # 4 each contained 3 kilograms of cocaine destined for HUBBART. Each of the 11 kilograms of cocaine seized was identically wrapped / packaged and each had the same mustang horse imprinted on the kilograms. The individual kilograms were then taped together in groups of 2 or 3 in each parcel.

35.     On June 7, 2019, United States Magistrate Judge Mary Gordon Baker, District of South Carolina, authorized a warrant for the geo-location information of TARGET TELEPHONE 13 used by EDWARDS, for a period of 30 days. On this same date, DEA began receiving geo-location information of TARGET TELEPHONE 13.

36.     On June 8, 2019 at approximately 1:48 p.m., HUBBART, using TARGET TELEPHONE 11, made an outgoing call to ELLIS. The following is a transcript of the intercepted communication:

> ELLIS: Hello
> HUBBART:  Hey Ms. Diane.
> ELLIS:  Joe was trying to get to you.   Hold on, let me try callin him back.
> HUBBART:  Okay.
>
> (LONG PAUSE)
>
> JAMES:   Hello?
> ELLIS:  X man on the phone.
> HUBBART:  What's up Joe?
> JAMES:   Hey he in the bathroom, I'm gonna give him a call. Hold on, hold on, he right here.
> EDWARDS:   What's up? We by Family house right now.

33



HUBBART:  Alright
EDWARDS:  The phone in the car.  Where you?  I tell him wire some money out for
me no?
HUBBART:  Gotcha gotcha.  I'll be, I'll be, tell Family I'll be on 78 in about 30 minutes
EDWARDS:  You gonna pass Family u/i up top u/i?
HUBBART:  No no no, I ain't comin to the 'ville, I comin to the Sphinx.  He know
where we always met up at.
EDWARDS:  No, listen to me.  I'm up top.
HUBBART:  You right there on Macon?
EDWARDS:  I'm up top where I live at.  Up top here u/i
HUBBART:  Oh you at ..
EDWARDS:  Used to live by it.
HUBBART:  Oh, gotcha.
EDWARDS:  Yeah, up top.  What time you gonna come this side?
HUBBART:  Probably about 30 minutes I'll be in that area.
EDWARDS:  Alright. Yeah just call me.
HUBBART:  Alright.
EDWARDS:  As you get off on the exit call me.
HUBBART:  Alright.

Surveillance of EDWARDS and JAMES as well as the geo-location of TARGET TELEPHONE

13 used by EDWARDS confirmed that both EDWARDS and JAMES were spending extended

periods of time at **208 Louie Lane, Ladson, SC** during EDWARDS visit to Charleston, SC.

Based on intercepted communications of TARGET TELEPHONE 11, I learned that EDWARDS

was collecting drug proceeds to be smuggle to California to pay for drugs distributed by the DTO

in South Carolina.

37.    On June 10, 2019 at approximately 12:03 p.m., surveillance of EDWARDS at the

Comfort Inn & Suites located at 4715 Saul White Blvd in North Charleston, SC observed

JEFFERSON arrive at the hotel, exit his vehicle carrying a red bag and meet with EDWARDS

before the two entered the hotel. A short time later, JEFFERSON and EDWARDS departed the

hotel and traveled to the Walmart at the Tanger Outlets in North Charleston, SC. EDWARDS was

observed purchasing new cardboard shipping boxes, spray foam, and packing tape before the two

returned to the hotel. Approximately one hour later, EDWARDS traveled to the Staples at the

Tanger Outlets in North Charleston, SC where he was observed purchasing new cardboard



shipping boxes in the copy and print section. EDWARDS returned to the hotel and after approximately 30 minutes, JEFFERSON departed the hotel with the same red bag that now appeared to have a box inside. JEFFERSON traveled to the FedEx Office store located at 3032 W Montague Ave in North Charleston, SC and entered with a brown box in his hand. JEFFERSON was observed shipping the parcel. Approximately one hour later, JAMES arrived at the hotel in his silver BMW 745. EDWARDS was observed meeting with JAMES before the two traveled to the same FedEx Office, and EDWARDS retrieved multiple empty FedEx boxes. Surveillance observed EDWARDS and JAMES travel to **208 Louie Lane, Ladson, SC** arriving at approximately 3:43 p.m. EDWARDS and JAMES remained inside **208 Louie Lane, Ladson, SC** until approximately 4:04 p.m. when they departed in JAMES' BMW. EDWARDS and JAMES returned to the same FedEx Office store. JAMES was observed entering the store with a white FedEx box and shipping the parcel. After both parcels were turned over to FedEx for shipment, agents intercepted the following parcels:

    Parcel shipped by JEFFERSON:
    7877 8821 8120

    From Address:
    Nethan Cooper
    3533 Jonah St
    North Charleston, SC 29406

    To Address:
    ATTN: Mark Mumble
    JNC Shipping and Office Supplies
    8013 Archibald Ave
    Rancho Cucamonga, CA 91730


    Parcel shipped by JAMES:
    7877 9300 1243

    From Address:
    Mathew Carlos James
    830 Locksley Dr



Charleston, SC 29407

To Address:
Mark Mumble
JNC Shipping and Office Supplies
8013 Archibald Ave
Rancho Cucamonga, CA 91730

On June 12, 2019, United States Magistrate Judge Mary Gordon Baker, District of South Carolina

authorized search warrants for the two parcels. Upon executing the search warrants, agents

discovered $46,050 in the parcel shipped by JEFFERSON and $26,000 in the parcel shipped by

JAMES. The name listed on both parcels, Mark Mumble, is a known alias for Mark Martin, who

was arrested with ECCLESTON in June 2018 after the discovery of approximately 66 kilograms

of cocaine and over $1 million in drug proceeds. The address listed on both parcels, JNC Shipping

Office Supplies, 8013 Archibald Ave, Rancho Cucamonga, CA, is the same location used to ship

4 FedEx parcels in February 2019 that were seized and found to contain 11 kilograms of cocaine

destined for HUBBART, JEFFERSON and JAMES among others. Based on these facts and

intercepted communications, I believe the money shipped by JEFFERSON and JAMES at the

direction of EDWARDS was drug proceeds destined for ECCLESTON in California.

38.    On June 13, 2019 at approximately 9:58 a.m., HUBBART, using TARGET

TELEPHONE 11, received an incoming call from JAMES, using TARGET TELEPHONE 16.

The following is a transcript of the intercepted communication:

> HUBBART: And now them boys tryin to do some other shit like, like I say Family, I
> meant what his name was, uh, General, saying he got his shit fuck up like he had need to
> change the damn, you know what I mean, see his bread or what not. I tell him, I say how
> you makin such damn business but hey, because that nigga fuck y'all up, don't think it
> about to be no rush over here with me! I tell General that shit, I say it ain't about to be no
> rush over here with me now. I say I already see it right now. I said I ain't about to move
> no faster.   I say I got one of them things gone. I ain't about to tell nobody else, I ain't
> about to tell them boys no time soon that, I (u/i) them boys will be alright now, you
> moving like this, you need to drop that ticket for me.
> JAMES:  Exactly.
> HUBBART:  I say so whatever the fuck they got going on them other areas, I said that

36



shit ain't got nothing to do with what we got going on. And he's like, yeah I understand man, I understand.   Alright, let your boy know that cause you know your boy's trying be like put the pressure on some fuckin body. I not doing that shit. I aint doing that shit. Hell no.

JAMES:   Alright. Yeah man.   And that's the thing.   That's how you know goddamn, them boy be frontin em the shit.   You see what I'm sayin? I tell you bruh, I the only nigga gotta pay for my shit bruh.

HUBBART: Yeah.   And that's fucked up because them boys tryin to (u/i) like someone kinda felt bad cause he ain't got no sympathy, he ain't got no sense.   Y'all tellin him that?!  Is y'all tellin him, does he know what the fuck he was supposed to not do?   You know what I'm saying like. Oh man, Pops he, I don't give a fuck!

JAMES:   And it's just so crazy cause you got Ms Diane callin me talking about she don't believe he had money in the box and all types of shit.   And I been on the shit you been on. Don't talk about him because you don't like him, you know what I'm sayin.   Or whatever.   Damn, I don't think he had no money in that box.   Shit, hey I don't know. You know what I'm sayin?   Shit I wasn't there.   I don't know, I don't know what happened.

HUBBART:   Them boys uh, shit, the lady, she fuck around and look at that shit.   She say she say them boys, the shit did get take by the police.   That what the lady said!   It went back and forth another scan on that shit I guess after you had call them boys. Them boys put a scan on there sayin that that shit was delivered and all man.

JAMES: Right.

HUBBART:   Yeah like them boys delivered the package to California in twelve minutes!   How the fuck you do that?! That shit, (u/i) the same FedEx drop boy!

JAMES:   Right.

HUBBART:   You tell that nigga sit the fuck down. You tell him you ain't got no plays for no thing. 'Cause I guess he must be there with some boys, cause he asked me if I ain't got no plays for um, you know for the little lady or whatever.   I tell him no, I said not right now.   I say what your ticket, he said I got a ticket of 32.   I say no, not right now.

JAMES:   Right.   Those people, you believe them people get that bread man, bruh.

HUBBART:   Man, I know them boys talkin shit man. (u/i.) Man, I said them boys got that money.   I don't care what Ms Diane say, I said them boys went back and put a scan on it because you call, so that's why they put that scan on it.

JAMES:   Right

HUBBART:   Them boy done mount up on themselves.

JAMES: Right

HUBBART: They sayin that um, they tell ol boy in there, they send Cooper in there and tell Cooper your package is delivered.

JAMES:   They tell Cooper his package got delivered?

HUBBART:   Yeah man.

JAMES: Oh yeah, that's how you know them boys steal that. You know another thing about it?   You gotta stamp that shit when you be like my shit be gone in fifteen minutes. You feel me? Word!

HUBBART:   You just (u/i).

JAMES:   I just run up in a goddamn road block pretty much.

HUBBART: Yeah. (u/i) you know u/i man.

JAMES:   Word! That's all I really did is ran in a fuckin roadblock cause that nigga did

37



that dumbass shit. Word! That shit there crazy man! He tell me he had send Cooper in that shit, and damn um, I think say them boys say the lady in there working or some shit.

HUBBART:   Nah, that boy say that shit got sent to California.   What they tell Cooper.

JAMES:   Right. And them boy lied.   Them boy take that shit outta em, his damn pay (u/i)

HUBBART:   What the fuck you mean?

JAMES:   I don't give a fuck what kinda fuckin transportation you got, I bet you ain't get there that fast!

HUBBART:   Yeah.   That's what they say boy you gotta have that type shit that aint calculate.

JAMES:   That shit ain't even say reach Memphis, you know what I'm sayin?

HUBBART:   That shit done went from Charleston to Cali.

JAMES: You know what I mean?   Word! That shit crazy man. Yeah man. And I hear him on the phone yesterday when he been to my house, when it been raining and shit, so he been to the house yesterday early, talkin about some, uh, everything, General say everything he give your boy in Beaufort, my man always come through and do the right thing. Joe always fucking shit up and shit. Y'all given all them boys shit but y'all ain't giving me shit!

HUBBART:   Listen, he be stealin too man!

JAMES:   For real?

HUBBART:   Yeah, boy he stealin. Man went in my package tryin to tell me that I ain't had nothing, that I ain't had (u/i).

JAMES:   Yeah you did tell me that. That shit done happen one time before too when I had give little Joe some bread, he been like the shit's been damn 500 short.   Like, how it gonna be an even 500 short?   Man, get outta here!

HUBBART:   I said, Joe I count that fuckin money in your face. Me and Joe sat right there, I counted that shit. I count that shit, I count that bitch three times. I count that bitch before I left the house, at Joe house, and I use the counter. Man, get the fuck outta here!

JAMES:   Them boys be having me thinkin crazy bruh.   I ain't gonna lie to you.   Like damn, let me see how I can run game on them boys. But I don't be having them boys stopped, you feel me?

HUBBART:   Yeah. And it ain't like it seem, like he tryin to eat, them boys (u/i), like I say I guess they must be shittin at them niggas for that.   What the fuck is he sayin like?

JAMES: Ok.

HUBBART: Like why the fuck, y'all better handle that shit! Being that he get the shit take, now he gonna back up. Why main man let him, why he let them boys (u/i) fuckin come?

JAMES:   Right, that's my whole thing. You don't have to do that.

HUBBART:   You tell me you gotta let the money go?   You don't!   This ain't Cali bro! We don't let them boys take our cars down here, not no probable cause.   So they say they'll get the dog?   So?   That don't mean your fuckin car bro!

JAMES:   Exactly.  Exactly.

HUBBART:   I had nothin in your fuckin stuff, what you steal for?   Nigga, I'll fight that shit. No you ain't goin in my car.   And I ain't got nothing in my shit!   They probably asked them. I know what they did.   They asked them, 'You got any drugs, weapons or guns they said?' And he tell them boys, no you can search. Oh you don't mind? Yeah, that what the fuck he did! Talk them too much.   He did that shit in October! You had went



when I picked him up, that time when he got locked up in October with them other little niggas.

JAMES: Uh, I had picked him up, you talkin about when um he been at the room?

HUBBART: At Leeds. Yeah, he was smokin in the car.

JAMES: Yeah. I had to go and get him.

HUBBART: Yeah, cause he tell them boys...he said, like I tell them boys, don't tell them boys to search your fuckin car man. Like whoa! When the man asked, the man said 'you got any more shit in here?' He be like 'no.' He said he wasn't even in the fuckin car. He was standing outside the gas station, walkin around the corner. He let the man search the car. Oh yeah, he took some shit! That nigga, the whole 500 thousand seized, a couple of 80 thousand.

JAMES: That shit crazy.

HUBBART: South Carolina about to have a new lineup of cars, boy.18

39.    On June 14, 2019 at approximately 7:52 p.m., HUBBART, using TARGET TELEPHONE 11, received an incoming call from JAMES, using TARGET TELEPHONE 15. The following is a transcript of the intercepted communication:

HUBBART: This man tell me give him 8 bands out of Generals Money.

JAMES: Give him 8 bands? Yeah?

HUBBART: Yeah give him the 8 bands so he can get situated or whatever.

JAMES: Yeah.

HUBBART: I been like shit, you going to let General know? I don't want General looking at me and all some fucking way. Man has changed and shit and now you 8 bands short.

JAMES: I don't know what the fuck that nigga got going on man.

HUBBART: He tell me not to mention it to you and I don't see what the fuck the issue was.

JAMES: Not to mention it to me?

HUBBART: Yeah, I say what the fuck you got to do with it.

JAMES: That dogs money, ya feel me?

HUBBART: Right, right.

JAMES: I ain't got nothing to do with that, I don't know what that man got going on.

HUBBART: Guess them packages, I know some packages coming in tomorrow.

JAMES: Oh that girl?

HUBBART: No that other one, the tree.

JAMES: Oh the tree, yeah he told me about that.

HUBBART: U/I   I know them shit coming soon.

JAMES: He had tell me, shit I don't even want to move them though.

HUBBART: Yeah....I ain't touching them mother fuckers.

JAMES: Right, yeah I don't want to move it for them...tell you the truth...that nigga

---

18 Based on the intercepted communication, my experience in this case and my training, I believe that HUBBART and JAMES were discussing the seizure of drug proceeds shipped through FedEx by JEFFERSON and JAMES to ECCLESTON at the direction of EDWARDS. HUBBART also specifically mentions keeping drug proceeds in a vehicle and law enforcement searching vehicles.



there…They fools man…I had to jump on them fools yesterday…we been talking…he had ask me 'Um Family I thought you were going to send all of the money back over' No…he had told me to send the 16,500 back over and keep all the profit.   I said Im not sending all the money back over.. I tell them straight up I been like fuck that shit man…man ill pull up on lil joes ass boy…and tell you fuck my money up whats wrong with you…I don't give a fuck about that nigga man..he got that shit fucked up. 'No family I don't want no problems, I'll get you your money back'   yeah thats cool but don't be asking me about if I sending everything back because we had that discussion…I'm going to keep the profit off of this 8-5, I mean off of this 8 and then I get 4 yesterday…and I'll send everything off this one so we can get more, but that 5, I'm keeping the profit off of that…and I still 21 bands in the hole..that nigga had me shitting boy, word.
HUBBART: Shit with y'all two back and forth it's going to make me go to this mans front door.

(General communication about HUBBART and JAMES being mad at EDWARDS)

JAMES: He bring some other nigga to my house today, dog say he work on the airline …said he can move the money on the plane and shit. He work for them boys and shit…some other Jamaican nigga…they all work for them boys.. So he can take any amount he want….Why you telling me this shit…thats y'all department to handle that shit.
HUBBART: That got nothing to do with me…you just let me know when the money need to be passed out.
JAMES: Alright.
HUBBART: You letting to much information out…you always want to cross channels with each other man.
JAMES: Exactly…he telling me these things because at this point right now he know I the only one right now doing what I do besides you…you see what I saying…and General shitting with Joe. You feel me?
HUBBART: Yeah, I already know he had U/I for that early money man.
JAMES: Yeah, General shitting with that boy…General shitting …General said that boy gonna pay for that shit…yeah everything good man…I guess we will link up tomorrow.[19]

40.     On July 9, 2019, United States Magistrate Judge Bristow Marchant, District of

South Carolina, authorized a warrant for the geo-location information of TARGET TELEPHONE

15 and TARGET TELEPHONE 16, both used by JAMES, for a period of 30 days. On this same

date, DEA began receiving geo-location information of TARGET TELEPHONE 15 and TARGET

---

[19] Based on the intercepted communication, my experience in this case and my training, I believe that HUBBART and JAMES were discussing the drug proceeds seized by law enforcement and that EDWARDS was directing HUBBART to take an amount out of drug proceeds destined for ECCLESTON and give the money to EDWARDS. When the two discuss parcels arriving, I believe that they are referring to drug laden parcels through FedEx and USPS. Based on my training and experience and my experience in this case and the previous interception of telephones used by EDWARDS, I know "girl" is code for cocaine and "tree" is code for marijuana.





TELEPHONE 16.

41.     On July 11, 2019 JAMES was indicted by a federal grand jury in Charleston, South Carolina for violations of Title 21, USC 841, 843 and 846 and Title 18, USC 2.

42.     An analysis of the geo-location data for TARGET TELEPHONE 15 and TARGET TELEPHONE 16 indicates that JAMES spends a considerable amount of time at **208 Louie Lane, Ladson, SC**, including extended time through the night.

43.     Based on the intercepted communications, confidential sources and cooperating defendants, physical surveillance as well as my experience in this case and my training, I believe JAMES is distributing drugs for the DTO and evidence of JAMES' participation with the DTO will be found at **208 Louie Lane, Ladson, SC**. I also believe that JAMES uses **208 Louie Lane, Ladson, SC** to conceal records of his criminal activity because JAMES is a large scale distributor for the DTO. I believe JAMES uses **208 Louie Lane, Ladson, SC** to primarily store drugs and as such books, records, receipts, notes, ledgers and other papers relating to the cost of, and profits from, ordering, purchasing, transporting and distributing drugs, in particular cocaine and marijuana will be found there. I believe JAMES resides at **208 Louie Lane, Ladson, SC**, and as such based upon my training and experience, I believe that drug proceeds as well as records, receipts, ledgers and other documents or records relating to the shipment transportation or delivery of U.S. currency, drug-related proceeds or assets by wire, courier or other means will be found there. I believe that at indicia of occupancy, residency, rental and /or ownership of **208 Louie Lane, Ladson, SC** or of any vehicles or other conveyances; including, but not limited to, utility and telephone bills, cancelled envelopes, rental, purchase or lease agreements, titles, registration documents, and keys as well as the telephones used by JAMES and intercepted during this investigation, to include TARGET TELEPHONE 12, TARGET TELEPHONE 15 and TARGET TELEPHONE 16 will be found at **208 Louie Lane, Ladson, SC**.

## 10825 DORCHESTER ROAD APT 2028, SUMMERVILLE, SC

44.    **10825 Dorchester Road Apt 2028, Summerville, SC** is the residence of Joseph JEFFERSON, a/k/a "Joe," a/k/a "little Joe," a/k/a "uncle Joe." A query of the South Carolina Department of Motor Vehicles revealed that JEFFERSON provided his address for his driver license as 2554 Jonah Street, North Charleston, SC. I believe that the residence located at 2554 Jonah Street is owned by JEFFERSON, however it is not where he is currently residing. Based on two cooperating defendants, numerous parcel seizures and surveillance, I know that the DTO used the residence located at 2554 Jonah Street as location to receive drug laden USPS parcels shipped by the DTO from California and distribute the drugs. When investigators began to make multiple seizures of drugs associated with that residence, the DTO altered their tactics and the residence no longer appears to be a location that is frequently used by the DTO. The vehicle that JEFFERSON has been observed operating on numerous occasions, a blue Chrysler 300 bearing SC tag "5627MN" is registered to JEFFERSON at 2554 Jonah Street, North Charleston, SC. Through training and experience, I know that drug traffickers will often acquire government documents such as a driver license and register their vehicles in nominee names or at addresses where they no longer reside to avoid revealing to law enforcement where they are actually living and keeping their personal possessions to include the cellular telephones that they have been intercepted using. On August 27, 2018, surveillance observed CHISHOLM meeting with JEFFERSON at 100 Saint Benets Place, Summerville, SC. On August 31, 2018 three USPS parcels shipped by the DTO were identified; two parcels were believed to contain cocaine and one parcel was believed to contain marijuana. Although the parcels were all addressed to different residences near 2554 Jonah Street, North Charleston, SC, surveillance observed all three drug laden parcels get delivered by Wayland PARKER, a corrupt USPS carrier, to EDWARDS who was waiting at 2554 Jonah Street. Surveillance then observed Terrill HOSKINS deliver one of the parcels suspected to contain

42



cocaine to JEFFERSON at 100 Saint Benets Place, Summerville, SC. Investigators were able to determine that at that time, 100 Saint Benets Place, Summerville, SC was being rented by JEFFERSON and a female that I believe to be JEFFERSON's wife. Investigators later learned that JEFFERSON moved from 100 Saint Benets Place, Summerville, SC. A search of law enforcement indices and public records identified that JEFFERSON moved to **10825 Dorchester Road Apt 2028, Summerville, SC**. Since identifying **10825 Dorchester Road Apt 2028, Summerville, SC** as JEFFERSON's current residence, investigators have observed JEEFERSON's Chrysler 300 at the apartment complex consistently parked near building 800, where **Apt 2028** is located. A subpoena to Dominion Energy requesting account information as of July 22, 2019 revealed JEFFERSON as the subscriber for utilities, with an open and active account at **10825 Dorchester Road Apt 2028, Summerville, SC** with service established in December 2018. Additionally, JEFFERSON provided his email as liljoe1349@gmail.com and his telephone number as 804-299-0589. During the interception of TARGET TELEPHONE 3, TARGET TELEPHONE 11 and the interception of a telephone used by ECCLESTON in the Central District of California, I know that JEFFERSON was often referred to by the DTO as "lil Joe." Furthermore, the search of Shaquille SMITH telephone on April 9, 2019 revealed multiple text messages with JEFFERSON concerning the drug trafficking activities of the DTO [reference paragraphs 48 and 49]. JEFFERSON was listed in Shaquille SMITH's telephone as "Uncle Joe" with the telephone number 804-299-0589. On May 29, 2019, JEFFERSON reported a vehicle stolen to the Summerville Police Department. According to the incident report, JEFFERSON stated that he came home to **10825 Dorchester Road Apt 2028, Summerville, SC** on May 28, 2019 and when he went to leave the next morning the vehicle was no longer there. In addition to providing his address as **10825 Dorchester Road Apt 2028, Summerville, SC**, JEFFERSON also provided his telephone number as 804-299-0589. During the intercepted communications of TARGET TELEPHONE 3 used by EDWARDS and



the interception of a telephone used by ECCLESTON in the Central District of California,

JEFFERSON discussed both drug trafficking and the movements of drug proceeds.

45.    On October 15, 2018 at approximately 5:11 p.m., EDWARDS, using TARGET

TELEPHONE 3, received an incoming call from JEFFERSON. The following is a transcript of a

portion of the intercepted communication:

> JEFFERSON: Alright, well I on my down right now anyways, so where you wanna meet
> at? Come to my house.
> EDWARDS: Umm, I down at your house and I'm taking care of something else.
> JEFFERSON: Come to the house, I'll be there.
> EDWARDS: Look here, I'm down at your house.
> JEFFERSON: That's what I'm talking about! Oh you already at my house?
> EDWARDS: Yes Joe!
> JEFFERSON: Alright, I coming.
> EDWARDS: Don't bring nothing down here, Joe. To your house, don't bring nothing
> down here cause you know we gonna talk.
> JEFFERSON: I already got the shit on me, what the hell you talking about?
> EDWARDS: Well Joe, me don't want nothing, Joe I don't want nothing down here man!
> Down here too much hot man, everything hot man. Where you gonna take the shit Joe,
> man? I don't want...Joe just give me a minute Joe man, I wanna hollar at you man, come
> on man.
> JEFFERSON: Alright. I coming man.
> EDWARDS: Yeah man, for real for real. Can't put that shit down man, come on man,
> everything good man.
> JEFFERSON: Alright.

On October 15, 2018 at the time of the intercepted communication, EDWARDS was located at

2554 Jonah Street, North Charleston, SC. Based on the intercepted communication, I believe that

JEFFERSON was bringing EDWARDS drug proceeds. Because of the seizure of parcels,

EDWARDS was concerned about the location being under surveillance by law enforcement,

referring to the location as "too much hot."

46.    As described above, in late February 2019 based on intercepted communications of

ECCLESTON's telephone, agents seized four parcels at the FedEx hub located in Memphis, TN

that were shipped from JNC Shipping Office Supplies, 8013 Archibald Ave, Rancho Cucamonga,

CA on February 25, 2019 addressed to four separate locations in North Charleston, SC on



HUBBART's assigned FedEx delivery route. The intercepted communications revealed that one parcel of drugs was sent for JAMES and the other 3 parcels of drugs were sent for HUBBART to distribute. Specifically, before the four parcels were shipped on February 25, 2019 JEFFERSON said he checked and then asked if HUBBART had sent him two addresses. ECCLESTON told JEFFERSON to send him one but then affirmed that he received two addresses from HUBBART. JEFFERSON acknowledged and said that ECCLESTON could use those two addresses. ECCLESTON then asked JEFFERSON if he could send him an additional address. JEFFERSON said he can try to look up one and as a matter of fact he can use the hand to hand, that Charleston one but he will call to make sure it is good. On February 26, 2019, ECCLESTON and EDWARDS discussed that a portion of the seized cocaine was destined for JEFFERSON through HUBBART. Based on the intercepted communication, my experience in this case and my training, I believe that ECCLESTON received one address from JAMES and two addresses from HUBBART but ECCLESTON wanted a fourth address to ship cocaine destined for JEFFERSON. On February 27, 2019, JEFFERSON explained to ECCLESTON that EDWARDS told him to call ECCLESTON. ECCLESTON told JEFFERSON that he needed to see the guys so they can sit down and pencil out something. JEFFERSON said he knew he couldn't come this weekend or next weekend but the weekend after that he will be visiting ECCLESTON.

47.     On March 1, 2019, search warrants were issued in United States District Court, District of South Carolina for the four parcels. Upon executing the search warrants, agents discovered each parcel contained an identical box built of "luan" plywood. Agents opened each of the plywood boxes and found packing peanuts and bricks of cocaine taped together with brown packing tape. Parcel # 1 contained 2 kilograms of cocaine destined for JAMES while Parcel # 2, # 3 and # 4 each contained 3 kilograms of cocaine destined for HUBBART and JEFFERSON. Each of the 11 kilograms of cocaine seized was identically wrapped / packaged and each had the same



mustang horse imprinted on the kilograms. The individual kilograms were then taped together in groups of 2 or 3 in each parcel.

48.    Based on analysis of the parcel activity conducted by the DTO, two USPS parcels suspected to contain drugs shipped by the DTO were identified. These two parcels were addressed to two different addresses near 2554 Jonah Street, North Charleston, SC and both addresses were on Wayland PARKER's assigned USPS route. PARKER is a corrupt USPS carrier that provides addresses to the DTO in California to ship drug laden parcels that PARKER then intercepts and delivers to the DTO in Charleston, SC. Surveillance of PARKER observed him pull to the side of the road just off of Rivers Ave in North Charleston, SC. At that time, Shaquille SMITH arrived and parked behind PARKER's marked USPS vehicle. Surveillance observed PARKER pass the two USPS parcels to SMITH just as PARKER had done with EDWARDS on numerous occasions in 2018 at 2554 Jonah Street, North Charleston, SC. SMITH placed the parcels in the trunk of his vehicle and departed. A lawful traffic stop of SMITH was conducted and the two USPS parcels were recovered. A search warrant of the two USPS parcels revealed approximately 23 pounds of marijuana within. SMITH was advised of his Miranda Rights and explained that JEFFERSON instructed him to go pick up the USPS parcels from PARKER and then leave the 2 USPS parcels inside 2554 Jonah Street, North Charleston, SC where JEFFERSON would retrieve them and distribute the marijuana. SMITH stated that he did not have his key to 2554 Jonah Street, North Charleston, SC and needed to go pick up his girlfriend from work so he left from meeting PARKER with the USPS parcels in the trunk of his vehicle and did not leave them at 2554 Jonah Street, North Charleston, SC as JEFFERSON had instructed him. After the traffic stop of SMITH and the seizure of the marijuana, surveillance observed JEFFERSON arrive at 2554 Jonah Street, North Charleston, SC in his blue Chrysler 300. JEFFERSON entered the residence but did not stay long before he departed. Surveillance of JEFFERSON was maintained as he travelled to 2810 Ashley



Phosphate Road in North Charleston, SC and backed into a parking space in the parking lot of the Chill-N-Grill. An unidentified male entered the front passenger seat of JEFFERSON's Chrysler 300 and the two were observed talking for approximately 15-20 minutes. The unidentified male then exited JEFFERSON's Chrysler 300 and surveillance of JEFFERSON continued. JEFFERSON travelled to **10825 Dorchester Road, Summerville, SC** and was observed exiting his Chrysler 300 and entering **Apartment 2028**.

49.    Later on April 9, 2019 a search warrant of SMITH's cellular telephone revealed a large amount of evidence corroborating the DTO's operation including images of multiple USPS and FedEx parcels shipped by the DTO in California, multiple kilograms of cocaine[20], and large amounts of suspected drug proceeds along with travel documentation and images of SMITH travelling from Charleston, SC to Los Angeles, CA with a large roller suitcase. SMITH's telephone also contained numerous text messages with JEFFERSON concerning details of the DTO's activities such as a commercial grade currency counter that JEFFERSON ordered from Amazon, JEFFERSON discussing with SMITH parcels shipped by the DTO in California to Charleston and SMITH's trip to California to deliver the large roller suitcase to someone at the direction of JEFFERSON.

50.    On June 10, 2019 at approximately 12:03 p.m., surveillance of EDWARDS at the Comfort Inn & Suites located at 4715 Saul White Blvd in North Charleston, SC observed JEFFERSON arrive at the hotel in his Chrysler 300M. JEFFERSON exited his vehicle and was observed carrying a red bag as he met with EDWARDS before the two entered the hotel. A short time later, JEFFERSON and EDWARDS departed the hotel and traveled to the Walmart at the Tanger Outlets in North Charleston, SC. EDWARDS was observed purchasing new cardboard

---

20 The images of the kilograms of cocaine seized from SMITH's cellular telephone showed the same style packaging used for the 11 kilograms of cocaine seized in February 2019 destined for HUBBART, JEFFERSON and JAMES among others.



shipping boxes, spray foam, and packing tape before the two returned to the hotel. Approximately one hour later, EDWARDS traveled to the Staples at the Tanger Outlets in North Charleston, SC where he was observed purchasing new cardboard shipping boxes in the copy and print section. EDWARDS returned to the hotel and after approximately 30 minutes, JEFFERSON departed the hotel with the same red bag that now appeared to have a box inside. JEFFERSON traveled to the FedEx Office store located at 3032 W Montague Ave in North Charleston, SC and entered with a brown box in his hand. JEFFERSON was observed shipping the parcel. Approximately one hour later, EDWARDS was observed meeting with JAMES at the hotel. JAMES and EDWARDS traveled to the same FedEx Office, and EDWARDS retrieved multiple empty FedEx boxes. EDWARDS and JAMES traveled to JAMES' residence before returning to the same FedEx Office store. JAMES was observed enter the store with a white FedEx box and shipping the parcel. After both parcels were turned over to FedEx for shipment, agents intercepted the following parcels:

Parcel shipped by JEFFERSON:
7877 8821 8120

From Address:
Nethan Cooper
3533 Jonah St
North Charleston, SC 29406

To Address:
ATTN: Mark Mumble
JNC Shipping and Office Supplies
8013 Archibald Ave
Rancho Cucamonga, CA 91730

Parcel shipped by JAMES:
7877 9300 1243

From Address:
Mathew Carlos James
830 Locksley Dr
Charleston, SC 29407



To Address:
Mark Mumble
JNC Shipping and Office Supplies
8013 Archibald Ave
Rancho Cucamonga, CA 91730

51.    On June 12, 2019, United States Magistrate Judge Mary Gordon Baker, District of South Carolina authorized search warrants for the two parcels. Upon executing the search warrants, agents discovered $46,050 in the parcel shipped by JEFFERSON and $26,000 in the parcel shipped by JAMES. The name listed on both parcels, Mark Mumble, is a known alias for Mark Martin, who was arrested with ECCLESTON in June 2018 after the discovery of approximately 66 kilograms of cocaine and over $1 million in drug proceeds. The address listed on both parcels, JNC Shipping Office Supplies, 8013 Archibald Ave, Rancho Cucamonga, CA, is the same location used to ship 4 FedEx parcels in February 2019 that were seized and found to contain 11 kilograms of cocaine destined for HUBBART, JEFFERSON and JAMES among others. Based on these facts and intercepted communications, I believe the money shipped by JEFFERSON and JAMES at the direction of EDWARDS was drug proceeds destined for ECCLESTON in California.

52.    On June 28, 2019 at approximately 9:10 a.m., HUBBART, using TARGET TELEPHONE 11, received an incoming call from EDWARDS, using TARGET TELEPHONE 13. The following is a transcript of a portion the intercepted communication:

> HUBBART: But umm, I met up with, I met up with Joe uh, one of Joe's people yesterday gave up and give him them things too. So, all them boy got it.
> EDWARDS: Yeah, they get what they supposed to get.
> HUBBART: Yeah, yeah, everybody got it, you know what I mean?
> EDWARDS: Who you give it to? Our boy there skip?
> HUBBART: Yeah, yeah, I ain't know who it been but he tell me it was one of his homeboys so I did, you know.
> EDWARDS: What the boy look like?
> HUBBART: Ahh, it been dark kind of. I just know he came outside with uh, it had been real dark Joe. It was back there off that same, his old road. Remember where he used to be at?
> EDWARDS: U/I place?
> HUBBART: Yeah, yeah.



EDWARDS: Where? That, where he used to be at?

HUBBART: Yeah, the one back there, way in the back.

EDWARDS: That... Yo! Look here.

HUBBART: Yeah?

EDWARDS: I don't want you to go there no more. You hear?

HUBBART: Alright.

EDWARDS: Don't go over there, don't go there no more because here is what happened now... Thats the same mother fuckin boy that get locked up.

HUBBART: Oh, yeah, yeah, yeah, he was given to the undercover. Yeah.

EDWARDS: Yeah, yeah, you don't want to see that boy. That boy... ya hear? Look here.

HUBBART: Yeah, yeah.

EDWARDS: The next time, if I tell ya to give it to Cooper, then they come and get it from Cooper.

HUBBART: I got you, ok.

EDWARDS: I don't want you to go around there.

HUBBART: Alright.

EDWARDS: I got people, you know what I'm sayin to you?

HUBBART: Yeah, I gotcha. I gotcha.

EDWARDS: Yeah you don't want to go around there. No time to talk, Fuck, fuck that. I have to take care of you.

HUBBART: I gotcha.

EDWARDS: Know what I'm saying to you?

HUBBART: Yeah I got you.

EDWARDS: Yeah for real for real, I have to secure you. That (inaudible) mother fucker get locked up and we had say where where where where

HUBBART: mmhmm

EDWARDS: (inaudible) This other people's shit to deal with him. You can go straight to him.

HUBBART: I got you.

EDWARDS: hmmmm so you can text him and ask him tell him the next time you gonna let bloodclaat Cooper take care of it, and him just come and get it from you.

HUBBART: Alright

EDWARDS: But your not goin to go back over there. No your not gonna go back over there. I don't want you to go back over there for any reason. People been watchin people been watchin on that side

HUBBART: mmhmm

EDWARDS: People (inaudible) no good.

HUBBART: I got you.

EDWARDS: (inaudible)

HUBBART: (inaudible)

EDWARDS: (inaudible)

HUBBART: [talking to a FedEx delivery customer] LONG PAUSE IN THE CONVERSATION

EDWARDS: Yo?

HUBBART: Yo?

EDWARDS: (inaudible)

HUBBART: Yeah



EDWARDS: If you know somebody that is an informer they gonna do this until
HUBBART: mmhmm
EDWARDS: I got to follow up today, so I don't want anything to go wrong.
HUBBART: I got you.
EDWARDS: Because your name, you see what I'm saying to you?
HUBBART: Yeah.
EDWARDS: So you know you aren't going to go tell Joe you not fuck with him, just tell him say your going to give it to Cooper.
HUBBART: Alright I got you.
EDWARDS: And if he call you (inaudible) for nothing.
HUBBART: I got you.
EDWARDS: Yeah, that's it nobody else. Look here, you can't make people (inaudible).
HUBBART: Right right
EDWARDS: No for real for real because (inaudible) I have to tell you.
HUBBART: I ain't even know he was still dealing with those boys.
EDWARDS: (inaudible) no I ain't going (inaudible) gotta leave that fuckin Cooper man. (inaudible) That's the same place that the SWAT team one street from. You hear.
HUBBART: Right and he back god damn.
EDWARDS: For real. That's at the same fuckin place. That's why you do certain things. You know?
HUBBART: Yeah.
EDWARDS: Do you see what I'm sayin to you? So you you need to stop (inaudible).21

53.     On July 11, 2019 JEFFERSON was indicted by a federal grand jury in Charleston, South Carolina for violations of Title 21, USC 841, 843 and 846 and Title 18, USC 2.

54.     Based on the intercepted communications, confidential sources and cooperating defendants, physical surveillance as well as my experience in this case and my training, I believe JEFFERSON is distributing drugs for the DTO and evidence of JEFFERSON's participation with the DTO will be found at **10825 Dorchester Road Apt 2028, Summerville, SC**. I also believe that JEFFERSON uses **10825 Dorchester Road Apt 2028, Summerville, SC** to conceal records

---

21 Based on the intercepted communication, my experience in this case and my training, I believe that HUBBART received a FedEx parcel that contained drugs destined for JEFFERSON. JEFFERSON arranged for HUBBART to deliver the drugs to John NIXON who lives on Prince Street in North Charleston, SC. Prince Street is in the same area as 2554 Jonah Street. On June 15, 2018, the North Charleston Police Department SWAT executed search warrants at 5226 Prince Street and 5235 Prince Street after making several controlled purchases of drugs from NIXON. During the search of the residences officers seized 53 pounds of marijuana, 10 grams of cocaine and 2 firearms (1 stolen) and arrested NIXON. Also discovered during the search were several opened USPS parcels with the address labels still intact. EDWARDS was concerned that HUBBART met with NIXON. I believe that JEFFERSON is continuing to arrange for drugs to be received and transported and I believe that Cooper is Gerald COOPER who may be a relative of JEFFERSON that lives on Jonah Street and has accepted drug laden parcels and structured drug proceeds for the DTO.



of his criminal activity because JEFFERSON is a large scale distributor for the DTO. I believe JEFFERSON uses **10825 Dorchester Road Apt 2028, Summerville, SC** to primarily store drugs and as such books, records, receipts, notes, ledgers and other papers relating to the cost of, and profits from, ordering, purchasing, transporting and distributing drugs, in particular cocaine and marijuana will be found there. I believe JEFFERSON resides at **10825 Dorchester Road Apt 2028, Summerville, SC**, and as such based upon my training and experience, I believe that drug proceeds as well as records, receipts, ledgers and other documents or records relating to the shipment transportation or delivery of U.S. currency, drug-related proceeds or assets by wire, courier or other means will be found there. I believe that at indicia of occupancy, residency, rental and /or ownership of **10825 Dorchester Road Apt 2028, Summerville, SC** or of any vehicles or other conveyances; including, but not limited to, utility and telephone bills, cancelled envelopes, rental, purchase or lease agreements, titles, registration documents, and keys as well as the telephones used by JEFFERSON and intercepted during this investigation, to include TARGET TELEPHONE 5, TARGET TELEPHONE 10 and the telephone JEFFERSON used to communicate with SMITH will be found at **10825 Dorchester Road Apt 2028, Summerville, SC**.

### 162 JENKINS ROAD, YEMASSEE, SC

55.    **162 Jenkins Road, Yemassee, SC** is the residence of Keith CHISHOLM, a/k/a "Saul." A query of the South Carolina Department of Motor Vehicles revealed that CHISHOLM provided his address for his driver license as **162 Jenkins Road, Yemassee, SC**. A subpoena to Dominion Energy requesting account information as of July 22, 2019 revealed Maybelle Scott as the subscriber for utilities, with an open and active account at **162 Jenkins Road, Yemassee, SC** with service established in December 1986. Agents know Maybelle Scott to be CHISHOLM's mother. During the intercepted communications of TARGET TELEPHONE 3 used by



EDWARDS, TARGET TELEPHONE 4 used by CHISHOLM, TARGET TELEPHONE 11 used by HUBBART and the interception of a telephone used by ECCLESTON in the Central District of California, CHISHOLM discussed both drug trafficking and the movements of drug proceeds.

56.    On September 22 and 23, 2016, a Confidential Source (CS-2)[22] acting as an illegal money launderer of drug proceeds received a series of communications to arrange the transfer of a large amount of drug proceeds. CS-2 was directed to receive drug proceeds and deposit the proceeds into multiple bank accounts ultimately being transferred back to a Mexican DTO. On September 24, 2016, Fredy LUNA, a Mexican born member of the DTO, coordinated via cellular telephone for CS-2 to arrive at the Hilton Garden Inn located in Beaufort, South Carolina. CS-2 followed LUNA to room 320 and upon entering the room, observed CHISHOLM sitting on the bed counting a large amount of U.S. currency. CS-2 waited in the hotel room as CHISHOLM and LUNA placed the U.S. currency into a suitcase, which they ultimately handed over to CS-2. CS-2 departed the hotel with the suitcase containing the U.S. currency and delivered the suitcase to agents. The transaction was captured on recording devices worn by CS-2. The total amount of U.S. currency provided by CHISHOLM and LUNA was $427,400. On June 14, 2018, DEA Newark, New Jersey agents arrested LUNA in Springfield Gardens, New Jersey during a buy bust operation where LUNA was attempting to deliver 22 kilograms of heroin. LUNA provided a post Miranda statement to agents corroborating the events of September 22 through 24, 2016, when LUNA and CHISHOLM delivered a large amount of drug proceeds to CS-2.

---

22 Beginning in or about 2004, the Confidential Source (CS-2) started to provide reliable and credible information and assistance to law enforcement in exchange for monetary compensation. All actions by CS-2 described herein were taken at the direction of the DEA. According to criminal history reports, CS-2 has no convictions in the United States.



57.    On March 14, 2018, a Cooperating Defendant (CD-2)[23] was interviewed pursuant to a proffer agreement. CD-2 provided that in late 2017, CD-2 purchased 4 1/2 ounces of cocaine for $4,500 from CHISHOLM on approximately three occasions and 9 ounces of cocaine on one occasion. CD-2 stated that the cocaine seized from CD-2 during search warrants[24] of CD-2's residences on November 15, 2017, was supplied by CHISHOLM.

58.    On June 5, 2018, agents conducting surveillance observed CHISHOLM driving a red/burgundy Ford F150. On June 6, 2018, agents observed the same Ford F150 backed into the driveway of 2554 Jonah Street, North Charleston, SC where parcel analysis and surveillance have identified a high number of parcels associated with the DTO have been delivered.

59.    On August 8, 2018, surveillance located CHISHOLM traveling from Charleston on US 17 Southbound in Ravenel, SC driving a champagne color Honda Accord bearing Florida license plate "IGSQ30."  A query of the Florida Department of Motor Vehicles revealed that "IGSQ30" is assigned to a 2013 Honda Accord registered to Ravonia Kay Chisholm[25] at 1140 Kendall Town Blvd 1203, Jacksonville FL 32225.  On August 10, 2018, at approximately 12:15, investigators observed the Gold Honda bearing Florida license plate "IGSQ30" that CHISHOLM was last seen driving, parked at Northwoods Mall between JC Penney and Belks.  Moments later, surveillance observed CHISHOLM exiting the mall and walk to the Honda Accord. CHISHOLM

---

23 In 2017, CD-2 was indicted by a federal grand jury in the District of South Carolina. CD-2 has been convicted of failure to stop for blue light and hit and run with bodily injury (2005), possession of marijuana (2005), drugs manufacture/distribute meth or cocaine base and manufacture/possess schedule V drugs with intent to distribute (2005), purse snatching (2009), unlawful carrying of weapon (2011), possession of marijuana (2012), malicious injury to personal property, manufacture/ distribute/possess schedule I and II drugs, and possession of weapon by certain person/stolen gun (2013). CD-2 has pending federal drug charges related to a separate investigation. Information provided by CD-2 in that investigation was corroborated through the court ordered intercepts related to the investigation in which CD-2 was charged, surveillance and proffered information provided by other co-defendants and has thus been deemed credible. CD-2's motivation for cooperating was judicial consideration.
24 On November 15, 2017, law enforcement executed a search warrant at CD-2's residence and seized 140.6 grams of cocaine and 117.3 grams of crack. On the same date, law enforcement seized 63.g grams of cocaine during the execution of a search warrant at a "trap" house used by CD-2 to distribute drugs. CD-2 attributes the cocaine seized from both residences to CHISHOLM.
25 Ravonia Chisholm is believed to be CHISHOLM's sister that resides in the Jacksonville, FL area.



then met with a black female with long black hair. Surveillance observed the trunk of the Honda Accord open and CHISHOLM pick up 2 suitcases, one pink and one light blue. Shortly thereafter, surveillance observed a dark grey Toyota sedan bearing a Florida tag leave the area. This vehicle was believed to be a Toyota Camry registered to Kenton BONNEY, a courier that transports drug proceeds for the DTO. Moments later CHISHOLM driving exited the mall parking lot in the Honda Accord. Surveillance of CHISHOLM was maintained as he travelled from the mall in North Charleston, SC and returned to **162 Jenkins Road, Yemassee, SC**.

60.    On August 27, 2018, at approximately 2:00 pm, agents queried a South Carolina Law Enforcement Division (SLED) stationary License Plate Reader (LPR) positioned on Highway 17 in Charleston County, South Carolina that indicated CHISHOLM was travelling from Beaufort County, South Carolina to the Charleston, South Carolina area. An analysis of the toll records for TARGET TELEPHONE 4, used by CHISHOLM, detailed that while CHISHOLM was travelling he communicated by voice and by text with TARGET TELEPHONE 5, used by JEFFERSON. Agents located CHISHOLM travelling on 526 East at Leeds Avenue in a Honda Accord bearing South Carolina license plate "JMV593." A query of the South Carolina Department of Motor Vehicles revealed license plate "JMV593" is assigned to a Honda Accord and the registered owner is Maybelle F Scott of **162 Jenkins Road in Yemassee, South Carolina**. Agents followed CHISHOLM to the Summerville Place Subdivision and observed CHISHOLM pull into the driveway of 100 Saint Benets Place, in Summerville, SC. An analysis of toll records indicate that CHISHOLM, utilizing TARGET TELEPHONE 4, contacted JEFFERSON at approximately 2:41 pm on TARGET TELEPHONE 5. At nearly the exact same time, agents observed JEFFERSON arrive in a Dodge Journey[26] and enter the residence. Moments later, JEFFERSON exited the

---

26 The Dodge Journey had a "Rick Hendrick Dodge" sticker across the back windshield as well as the number "22." Agents contacted Rick Hendrick Dodge located at 8333 Rivers Avenue in North Charleston and learned that



residence and was observed meeting with CHISHOLM in the driveway of the residence. After a lengthy discussion, CHISHOLM departed in the Honda Accord and traveled back to Beaufort County, South Carolina.

61.     Based on analysis of the parcel activity conducted by the DTO, USPIS identified a parcel suspected to contain drugs shipped by the DTO and scheduled to be delivered in Beaufort County, South Carolina on September 6, 2018. The following parcel was identified:

    1)   Tracking Number 9405 5102 0088 3890 6620 93

        Destination Address:
        52 HORACE DAWSON LN
        SEABROOK, SC 29940

        Origin / Return Address:
        1259 N VINEYARD AVE
        ONTARIO, CA   91764

        Expected Delivery by: 09/06/2018
        Postage: $53.84
        Weight: 18 lb(s) 0 oz(s)

62.     Agents established surveillance in the area of Horace Dawson Lane in Seabrook, SC and identified the rural route USPS carrier operating a Honda CRV travel onto Horace Dawson Lane and make several stops at mailboxes along the route; however, the parcel addressed to 52 Horace Dawson Lane was not delivered. As agents observed the USPS carrier travel from Horace Dawson Lane onto Hwy 21, a Honda Accord bearing South Carolina license plate "JMV593" was observed turning from Hwy 21 into the driveway of a residence. Almost immediately, the USPS carrier turned into the same driveway. Agents observed the driver of the Honda Accord exit the vehicle and identified the driver as CHISHOLM, noting that CHISHOLM was wearing the same

---

the Dodge Journey was provided to JEFFERSON by the dealership while JEFFERSON's personal vehicle was being serviced / repaired. A query of SC DMV revealed that JEFFERSON is the registered owner of a 2002 Jeep and a 2005 Chrysler, both of which the address is listed as 2554 Jonah Street in Charleston, South Carolina.



clothing that he had been observed wearing during surveillance the previous day at Mosby Apartment Complex in Ladson, South Carolina. CHISHOLM approached the rural route USPS carrier's vehicle and leaned into the driver side window. CHISHOLM and the unidentified USPS carrier appeared to be in a discussion for several minutes before the USPS carrier departed and continued the USPS route. CHISHOLM immediately departed in the Honda Accord and traveled to a business located at 2 Broad River Road, Suite D in Beaufort, South Carolina. A short time later, CHISHOLM was seen exiting the building with a black bag over his shoulder and talking to a black male later identified as Rodrick CHISHOLM.27 CHISHOLM then placed the black bag into the Honda Accord at which time agents observed a parcel sitting on the back seat. CHISHOLM then departed the location in the Honda Accord and Rodrick CHISHOLM enter Rodrick's black Cadillac Escalade. A query of the tracking number for the USPS parcel addressed to 52 Horace Dawson Lane in Seabrook, South Carolina indicated that the parcel was delivered to the address, although surveillance identified that it was not. I believe that CHISHOLM received the parcel from the USPS carrier and the parcel observed in the back of CHISHOLM's Honda Accord was the parcel addressed to 52 Horace Dawson Lane in Seabrook, SC.

63.    On October 15 and 16, 2018 intercepted communications between EDWARDS using TARGET TELEPHONE 3 and CHISHOLM, using TARGET TELEPHONE 4 indicated that CHISHOLM would be traveling to deliver drug proceeds to EDWARDS. CHISHOLM explained that he would be arriving to meet EDWARDS at approximately 8:15 PM. CHISHOLM asked EDWARDS where he was at and EDWARDS stated, "up top." The geo-location of TARGET TELEPHONE 3 revealed EDWARDS was in the area of 3233 Ingleside Drive North Charleston, SC at the time of the intercepted communication. At approximately 7:36 PM, South Carolina Law

---

27 On October 26, 2000, CHISHOLM was interviewed pursuant to a proffer agreement through the United States Attorney's Office in Charleston, South Carolina. CHISHOLM identified Rodrick Chisholm as his second cousin and stated that Rodrick Chisholm distributed crack cocaine supplied by CHISHOLM.



Law Enforcement Division (SLED) stationary License Plate Reader (LPR) captured a vehicle bearing license plate "KNN506" traveling on US17 West bound toward Charleston, SC. A query of the South Carolina Department of Motor vehicles revealed that license plate "KNN506" is assigned to a Honda Odyssey registered to Frank Scott and Maybelle Scott at **162 Jenkins Road, Yemassee, SC**. At approximately 8:04 pm., agents observed that Honda Odyssey arrive at the 4000 building at the Mosby at Ingleside apartment complex. The Honda parked near the front of the building, backed into a parking space and agents observed CHISHOLM exit the vehicle wearing a white shirt and carrying a black book bag. At approximately 8:23 PM, CHISHOLM returned to the Honda carrying the same book bag and exited the parking lot. Based on the intercepted conversation and the surveillance, I believe that CHISHOLM arrived at EDWARDS's apartment and delivered drug proceeds. Intercepted communications and surveillance on October 17, 2019 revealed that those drug proceeds that CHISHOLM and others delivered to EDWARDS were ultimately smuggled in roller suitcases and flown via commercial aircraft to Los Angeles, CA and delivered to ECCLESTON.

64.    On December 15, 2018 agents established surveillance in the areas after learning of the delivery of a USPS parcel from the DTO CHISHOLM. At approximately 9:20 a.m., Rodrick CHISHOLM arrived at 2 Broad River Blvd., Beaufort, SC in his black Cadillac SUV and entered the business. Rodrick CHISHOLM immediately walked out of the business and began loading boxes and four white trash bags with blue ties into the rear cargo area of his Cadillac SUV. At approximately 9:32 a.m., Rodrick CHISHOM departed the business and travelled to the public waste site located at 130 Castle Rock Rd. Beaufort, SC. Investigators observed Rodrick CHISHOLM take the 4 trash bags and discard them at the public waste site. Shortly after Rodrick CHISHOLM departed the site, investigators retrieved the 4 trash bags and Rodrick CHISHOLM returned to 2 Broad River Blvd., Beaufort, SC. At approximately 11:43 a.m., CHISHOLM, dressed



in all black clothing, arrived and entered the business at 2 Broad River Blvd., Beaufort, SC. At approximately 12:08 p.m., a USPS truck arrived at the business and Rodrick CHISHOLM exited the business and met with the USPS carrier.   At approximately 12:10 p.m., Rodrick CHISHOLM entered the business carrying a USPS parcel and lock the door. At approximately 1:00 p.m., CHISHOLM and Rodrick CHISHOLM both departed the business. CHISHOLM was observed carrying what appeared to be a black colored shoe box in his right hand as he departed. Following the surveillance, agents inspected the contents of the 4 trash bags and seized numerous kilogram wrappers and packaging material that still contained cocaine residue, a USPS box with marijuana residue and plastic bags with marijuana residue, and miscellaneous paperwork in the names of Keith CHISHOLM and Rodrick CHISHOLM as well Bing Body Shop and Hill Top Beauty Supply (companies that I have learned to be used by CHISHOLM to facilitate the distribution of drugs and the transportation of drug proceeds).

65.    On December 19, 2018 at approximately 2:24 p.m., CHISHOLM, using TARGET TELEPHONE 4, made an outgoing call to Rodrick CHISHOLM. The following is a transcript of the intercepted communication:

> Rodrick CHISHOLM:   Huh?
> Keith CHISHOLM:   I'm getting close to home now.
> Rodrick CHISHOLM:   Did you find one?
> Keith CHISHOLM:   Yeah, uh huh.
> Rodrick CHISHOLM:   Ok
> Keith CHISHOLM:   Did you...what the hell I'm about to ask you? You, um,....you been in the little spot lately?
> Rodrick CHISHOLM:   At the spot?
> Keith CHISHOLM: Yeah.
> Rodrick CHISHOLM: Yeah, I been there this morning.
> Keith CHISHOLM:   Oh ok, alright.   You don't be seeing nothing ride by it funny or nothing?
> Rodrick CHISHOLM:   Uh uh (UI)
> Keith CHISHOLM:   Huh?
> Rodrick CHISHOLM:   I said I really paying attention now, but no I ain't seen nothing.
> Keith CHISHOLM:   I don't think...I think that motherfucker picked me up on 21.
> Rodrick CHISHOLM:   Yeah.



Keith CHISHOLM:   Yeah.   But a, did you...on that table there were some...some, the good, the good, the good grown.

Rodrick CHISHOLM:   Yeah.

Keith CHISHOLM:   That still there?

Rodrick CHISHOLM:   Yeah, I didn't touch it.

Keith CHISHOLM:   Is it, is it one or two still there?

Rodrick CHISHOLM:   I don't know.

Keith CHISHOLM:   I know one of them I went in and took (UI).   Huh?

Rodrick CHISHOLM:   I say whatever it been, I didn't touch it, I usually don't mess with none of that.

Keith CHISHOLM:   I took a four way out of it.

Rodrick CHISHOLM:   Yeah.

Keith CHISHOLM:   Um...I want to check to see if....if you get a chance, check and see. I need, I need that and, and inside the little thing I had one that was made up almost a whole, almost a whole, a single.

Rodrick CHISHOLM:   Yeah.

Keith CHISHOLM:   You seen that in there?

Rodrick CHISHOLM:   Yeah, that's in there.

Keith CHISHOLM:   I need a, I really need like half of that, like a 14.

Rodrick CHISHOLM:   Ok.

Keith CHISHOLM:    Man, let me tell you what happened last night.   I went by PPP...

Rodrick CHISHOLM:   Uh huh.

Keith CHISHOLM:   I went in one, went down the middle, took 1/2 of it (UI). You know what I'm saying?

Rodrick CHISHOLM:   Yeah.

Keith CHISHOLM:   And I measured both of them.   He was right there when I measure both of em.   I was like damn, I was like damn boy I pretty good.   Boy it come out, I'm talkin, even.   You know what I'm saying? Like 510.

Rodrick CHISHOLM:   Yeah.

Keith CHISHOLM:   And he look at it like yeah, so I was like just hold this for me. I get back this morning, it's a hair short.

Rodrick CHISHOLM:   Get the fuck out of here.

Keith CHISHOLM:   Yeah, so I was like how? Like, I had it secure. Like, how?

Rodrick CHISHOLM:   (UI)

Keith CHISHOLM:   Huh?

Rodrick CHISHOLM:   You thinking Herb?

Keith CHISHOLM:   (UI)

Rodrick CHISHOLM:   Huh?

Keith CHISHOLM:   If it ain't Herb, him. You know I used to have that problem before so that's why I would never would do that, you know what I'm saying?

Rodrick CHISHOLM:   Yeah.

Keith CHISHOLM:   But in this whole situation, I was just like, you know what I'm saying like?

Rodrick CHISHOLM:   Yeah, yeah, go on that side (UI)

Keith CHISHOLM:   Yeah, but this is, boy I need to try to see if I can get in and get this secured in house.   I'll call you back.



Rodrick CHISHOLM:   Ok, alright.[28]

66.    In late December 2018 based on the interception of TARGET TELEPHONE 4,

CHISHOLM was collecting and preparing $240,000 in drug proceeds that would be sent to

ECCLESTON. ECCLESTON was specific that the drug proceeds would need to be separated

into 4 bags of $60,000 each. CHISHOLM, using TARGET TELEPHONE 4 sent ECCLESTON

an image of a food saver bag that appeared to have stacks of US currency sealed within. On

December 27, 2019 surveillance observed CHISHOLM travel to meet with Damian MASON, a

commercial tractor trailer driver that collects and transports drug proceeds for the DTO, at a

hotel at Exit 33 on I-95. CHISHOLM arrived carrying a back pack and entered the hotel where

MASON was staying. Once inside of MASON's room at approximately 1:37 p.m., CHISHOLM,

using TARGET TELEPHONE 4, received an incoming call from ECCLESTON. The following

is a transcript of the intercepted communication:

> CHISHOLM: Yeah, um, he didn't like the way I had it.
> ECCLESTON: Oh? Let me talk to him.
> CHISHOLM: Alright.
>
> CHISHOLM hands TARGET TELEPHONE 4 to Damian MASON
>
> MASON: Hello?
> ECCLESTON: Hey, what happen?
> MASON: No, um, me see it, me carry the case for it.
> ECCLESTON: But the case can hold all of that?
> MASON: It could, but you know I don't mess with it the way it is, but I just work with it here.
> ECCLESTON: Yeah, but the case can hold all of it. That two hundred added up. You can't hold it all in the case?
> MASON: Me don't know, me going to have to call you back. But it's alright, me just work it how it's there.
> ECCLESTON: It's nothing if you open it and put it in with them...
> MASON: I am not going through all that right now.
> ECCLESTON: It is not like you have to leave U/I now.

---

28 Based on intercepted communication, my experience in this case and my training, I believe CHISHOLM was
describing that he split a kilogram of cocaine in half and it weighed 510 grams.



67.    From February 21, 2019 through February 25, 2019, intercepted communications of ECCLESTON's telephone in the Central District of California indicated that ECCLESTON had sent CHISHOLM a parcel that contained drugs. At that time, CHISHOLM was using telephone number 803-679-3558. On February 25, 2019, the USPS intercepted the following parcel intended for CHISHOLM:

9405 5102 0088 1977 9959 66

Subject Address:
Dianne Feinstein
23 Benjamin Smalls Rd
Seabrook, SC 29940

Return Address:
DJ Mailing Etc Inc
1259 N Vineyard Ave
Ontario, CA 91764

Following a K-9 alert for the presence of narcotics odor within the parcel, on February 26, 2019, a federal search warrant for the parcel was authorized by United States Magistrate Judge Mary Gordon Baker. The parcel contained three (3) kilograms of cocaine and was packaged in the same manner as the other parcels shipped by this DTO that contained cocaine that was ultimately seized.

68.    On February 25, 2019, CHISHOLM discontinued the use of telephone number 803-679-3558 after confirming that the drug laden parcel was seized by law enforcement. On February 26, 2019, at approximately 7:45 a.m., CHISHOLM communicated with ECCLESTON using TARGET TELEPHONE 17 for the first time. ECCLESTON asked CHISHOLM what was going on, and CHISHOLM responded that he didn't really know. ECCLESTON accused CHISHOLM of hiding from him all night, and CHISHOM explained that he was not hiding but that he had to go and get another phone. CHISHOLM reminded ECCLESTON that he had told him that something wasn't right with the thing. Based on the intercepted communication, my experience in



this case and my training, I believe CHISHOLM was referring to the previous communications when the drug laden parcel was seized by law enforcement. ECCLESTON confirmed what CHISHOLM believed about something not being right and asked CHISHOLM if that was what he was told. CHISHOM agreed, and ECCLESTON asked if CHISHOLM looked at the tracking information for the seized parcel. CHISHOM stated that he did not look at it this morning because of what happened and described that law enforcement had taken the parcel off the truck. ECCLESTON asked when, and CHISHOLM stated yesterday. ECCLESTON asked CHISHOLM if that was what "the girl" told him. Based on the intercepted communication, my experience in this case and my training, I believe ECCLESTON was referring to the corrupt USPS carrier that CHISHOLM uses to deliver drug laden parcels. CHISHOLM stated "yes." ECCLESTON interrupted saying he would call CHISHOLM back. CHISHOLM quickly interrupted ECCLESTON and told him that he did not want to talk on the other thing. Based on the intercepted communication, my experience in this case and my training, I believe CHISHOLM was referring to the telephone that CHISHOLM was using prior to the parcel being seized.

69.     On July 9, 2019, United States Magistrate Judge Bristow Marchant, District of South Carolina, authorized a warrant for the geo-location information of TARGET TELEPHONE 17 used by CHISHOLM, for a period of 30 days. On this same date, DEA began receiving geo-location information of TARGET TELEPHONE 17.

70.     On July 11, 2019 CHISHOLM was indicted by a federal grand jury in Charleston, South Carolina for violations of Title 21, USC 841, 843 and 846 and Title 18, USC 2.

71.     On July 19, 2019 I was contacted by the Beaufort County Sheriff's Office (BCSO) and advised that they had received information from a source of information. The BCSO source of information has previously provided reliable information to BCSO about drug investigations. The BCSO source of information described that a local drug user that often performs lawn



maintenance and receives payment in drugs, was working at the BCSO source of information's residence. The local drug user engaged in a conversation detailing his work for CHISHOLM at **162 Jenkins Road, Yemassee, SC**. The drug user explained to the BCSO source of information that on July 18, 2019 he observed "a load of dope" in a shed on CHISHOLM's mom's property located at **162 Jenkins Road, Yemassee, SC**.

72.     An analysis of the geo-location data for TARGET TELEPHONE 1, TARGET TELEPHONE 4 and TARGET TELEPHONE 17 indicates that CHISHOLM spends a considerable amount of time at **162 Jenkins Road, Yemassee, SC**, including extended time through the night.

73.     Based on the intercepted communications, confidential sources and cooperating defendants, physical surveillance as well as my experience in this case and my training, I believe CHISHOLM is distributing drugs for the DTO and evidence of CHISHOLM's participation with the DTO will be found at **162 Jenkins Road, Yemassee, SC**. I also believe that CHISHOLM uses **162 Jenkins Road, Yemassee, SC** to conceal records of his criminal activity because JEFFERSON is a large scale distributor for the DTO. I believe JEFFERSON uses **162 Jenkins Road, Yemassee, SC** to primarily store drugs and as such books, records, receipts, notes, ledgers and other papers relating to the cost of, and profits from, ordering, purchasing, transporting and distributing drugs, in particular cocaine and marijuana will be found there. I believe CHISHOLM resides at **162 Jenkins Road, Yemassee, SC**, and as such based upon my training and experience, I believe that drug proceeds as well as records, receipts, ledgers and other documents or records relating to the shipment transportation or delivery of U.S. currency, drug-related proceeds or assets by wire, courier or other means will be found there. I believe that at indicia of occupancy, residency, rental and /or ownership of **162 Jenkins Road, Yemassee, SC** or of any vehicles or other conveyances; including, but not limited to, utility and telephone bills, cancelled envelopes, rental, purchase or lease agreements, titles, registration documents, and keys as well as the



telephones used by CHISHOLM and intercepted during this investigation, to include TARGET TELEPHONE 1, TARGET TELEPHONE 4 and TARGET TELEPHONE 17 will be found at **162 Jenkins Road, Yemassee, SC**.

## 409 LAFAYETTE ROAD, HOLLY HILL, SC

74.    **409 Lafayette Road, Holly Hill, SC** is the residence of FNU LNU, a/k/a "Dread." A subpoena to Dominion Energy requesting account information as of July 22, 2019 revealed William Drayton as the subscriber for utilities, with an open and active account at **409 Lafayette Road, Holly Hill, SC** with service established in November 2012. However, the Dominion Energy account also lists Lebert Frasier as Drayton's roommate. A query of the South Carolina Department of Motor Vehicles revealed that Lebert FRAZER provided his address for his driver license as **409 Lafayette Road, Holly Hill, SC**. FRAZER has been identified through a previous DEA investigation as a marijuana distributor operating in Orangeburg and Berkeley Counties and according to arrest records, FRAZER's alias is "Dread." During the intercepted communications of TARGET TELEPHONE 3 used by EDWARDS and TARGET TELEPHONE 11 used by HUBBART, FNU LNU a/k/a "Dread" was discussed during communications concerning both drug trafficking and the movements of drug proceeds as well as the possession and distribution of firearms. During those intercepted communications, EDWARDS and HUBBART always referred to FNU LNU a/k/a "Dread's" residence where the drugs and drug proceeds as well as the firearms were located was in Holly Hill, SC.

75.    On October 21, 2018 at approximately 5:13 p.m., EDWARDS, using TARGET TELEPHONE 3, received an incoming call from Sherita RIVERS. The following is a transcript of a portion of the intercepted communication:

        EDWARDS:   Hello?
        RIVERS:   The boy on the way now.
        EDWARDS:   Which boy?



RIVERS:  The boy from the, um, the white Pontiac
EDWARDS:  Who?  Tell him don't come today.  Tell him don't come today. Tell him don't come today girl.
RIVERS:  Oh lord.
EDWARDS:  Listen to me.  The only thing you could do, me have to get one from the Dread. Tell tomorrow and give it to him.  I'll have to go up on the Dread and he'll call me and I'll give it to him and will take the money down there to me.  I don't got nothing here where I'm at.  You can do that?
RIVERS:  Alright, I'm not going to go all the way back down there.
EDWARDS:  Then tell him something, tell him something today.
RIVERS:  Huh?
EDWARDS:  Tell him Wednesday.  Look here, what I got.  Tell him I don't got all of it I want ask him he want to buy what I got here.  Tell him I got some good shit here.  Ask him if he want to buy what I got here.  Tell him it is some, some good shit.
RIVERS:  He wanted one.
EDWARDS:  That's what I'm saying, the amount what I got here don't equal to one. The one that I got is up at the Dread.  I don't got nothing more right here.
RIVERS:  Oh ok...so how much is that now?
EDWARDS:  I got almost, almost one.  The "cookies"...the good one.
RIVERS:  Alright
EDWARDS:  Tell him...look here, I'm gonna make it happen, alright?
RIVERS:  Hmm...hmm
EDWARDS:  You have to go up by the, you have to go up to the Dread and get one from the Dread and carry it to him later on.  I will just call it and get it off of the Dread. I'm saying to you?
RIVERS:  Uh, huh.
EDWARDS:  Alright. I really want to take care of everything so tell him that he could wait...till Wednesday. I'll be good Tuesday, be good Tuesday.


76.    On June 7, 2019, United States Magistrate Judge Mary Gordon Baker, District of South Carolina authorized a warrant for the geo-location information of TARGET TELEPHONE 13, used by EDWARDS for a period of 30 days. On this same date, DEA began receiving geo-location information of TARGET TELEPHONE 13.

77.    On June 15, 2019 at approximately 8:21 a.m., HUBBART, using TARGET TELEPHONE 11, received an incoming call from EDWARDS, using TARGET TELEPHONE 13. The following is a transcript of the intercepted communication:

EDWARDS: Hey!
HUBBART: Yo.
EDWARDS:  What I'm saying to you, if Family (JAMES) asks you if nothing come



through, tell him, say no.

HUBBART: I got you.

EDWARDS: Cause you know, I'm up here at the Dread (house). After, carry it up here man cause I want the money to put back in that money.

HUBBART: Alright. Got you.

EDWARDS: Cause that the General (ECCLESTON) money. That's why I, listen to what I say to you.

HUBBART: I got you, yeah.

EDWARDS: So I'm up at the Dread (house) right now. So the time you finish just come up here.

HUBBART:    Alright.

EDWARDS: I'm up here. Alright.

78.    On June 15, 2019, an analysis of the geo-location data of TARGET TELEPHONE 13 when that communication was intercepted in which EDWARDS describes that he is at the "Dreads" house indicated that EDWARDS was located at **409 Lafayette Road, Holly Hill, SC**. Based on previous intercepted communications HUBBART was working on his FedEx route and was in possession of parcel(s) that contained drugs sent by the DTO in California. EDWARDS was directing HUBBART to bring those drugs to **409 Lafayette Road, Holly Hill, SC** so they could be sold and the drug proceeds collected.

79.    On the evening of June 15, 2019 an analysis of the geo-location data of TARGET TELEPHONE 11 indicated that after completing his FedEx route, HUBBART was travelling to Holly Hill. At approximately 5:23 p.m., an analysis of the geo-location data of TARGET TELEPHONE 13 and TARGET TELEPHONE 11 indicated that both EDWARDS and HUBBART were located at **409 Lafayette Road, Holly Hill, SC**. At approximately 5:45 p.m., investigators observed HUBBART's silver Dodge Durango parked at **409 Lafayette Road, Holly Hill, SC**.

80.    On June 21, 2019 at approximately 6:30 p.m., an analysis of the geo-location data for TARGET TELEPHONE 11 indicated that after completing his FedEx route, HUBBART travelled to **409 Lafayette Road, Holly Hill, SC**. Based on intercepted communications of



TARGET TELEPHONE 11, HUBBART received parcel(s) that contained drugs sent by the DTO

in California while working on his FedEx route.

81.     On June 21, 2019 at approximately 8:21 a.m., HUBBART, using TARGET

TELEPHONE 11, received an incoming call from EDWARDS, using TARGET TELEPHONE

13. The following is a transcript of a portion the intercepted communication:

> HUBBART: What up?
> EDWARDS: Hey, you saw Dread already?
> HUBBART: Yeah, I saw him.
> EDWARDS: What happen there?
> HUBBART: He had people in front of him so he tell me just go ahead, you know what
> I'm saying?
> EDWARDS: What he said? I don't hear you.
> HUBBART: I said he had people in front of him so he tell me, he just took it and gave
> me a little change then told me to go ahead. He didn't want them boys to see me.
> EDWARDS: What he told you to do?
> HUBBART: Hold on… I said he passed me the change then told me to go ahead cause he
> had people in front of him.
> EDWARDS: Oh so you never give him the box?
> HUBBART: Yeah I did that but, yeah I did that but he told me to go ahead and go cause
> he had company. You know what I'm saying? He had them boys in front of him.
> EDWARDS: Oh, ok. He don't want nobody to know.
> HUBBART:   Right, right, right.
> EDWARDS:   So, what did he give you? He give you the 24?
> HUBBART: Yeah he gave me the 24.

82.     On June 25, 2019 at approximately 4:20 p.m., HUBBART, using TARGET

TELEPHONE 11, made an outgoing call to EDWARDS, using TARGET TELEPHONE 13.

During the intercepted communication, EDWARDS instructed HUBBART to go visit FNU LNU

a/k/a "Dread." At approximately 9:46 p.m. on June 25, 2019, an analysis of the geo-location data

for TARGET TELEPHONE 11 indicated that after completing his FedEx route, HUBBART was

travelling to Holly Hill. Based on previous intercepted communications, HUBBART received

FedEx parcel(s) that contained drugs sent by the DTO in California. At approximately 10:33 p.m.,

investigators observed HUBBART's silver Dodge Durango departing **409 Lafayette Road, Holly**

**Hill, SC** and returning to the Charleston, SC area.



83.    On June 27, 2019 at approximately 8:12 p.m., HUBBART, using TARGET

TELEPHONE 11, made an outgoing call to EDWARDS, using TARGET TELEPHONE 13. The

following is a transcript of the intercepted communication:

EDWARDS: Hey!
HUBBART: Yo Joe. So you saying now take the rest of these up that road, right?
EDWARDS: Yeah. Give it to the Dread.
HUBBART: Alright. I'm about to take that.
EDWARDS: (U/I) to go up there. That's all that has to go up there my man.
HUBBART: I got you. I'm doing that right now.
EDWARDS: Huh? You give Family two right?
HUBBART: Yeah, gave him two. Gave Joe.
EDWARDS: Gave Joe 3 right?
HUBBART: Yup.
EDWARDS: And you take your two.
HUBBART: Yup.
EDWARDS: The 2 (U/I) give that one to (U/I) go up the road. Right?
HUBBART: Right, right.
EDWARDS: Alright. Uh. The name write on the gelato right.
HUBBART: Yeah.
EDWARDS: Alright. Okay I'll talk (U/I)
HUBBART: Alright.
EDWARDS: And the time you go up there make the Dread call me you hear?
HUBBART: Got you.
EDWARDS: Alright thanks.
HUBBART: Alright.


84.    On the evening of June 27, 2019 an analysis of the geo-location data of TARGET

TELEPHONE 11 indicated that after completing his FedEx route, HUBBART travelled to Holly

Hill. On June 27, 2019 at approximately 10:16 p.m., HUBBART, using TARGET TELEPHONE

11, made an outgoing call to Anttwon HAYNES. When the intercepted communication began, the

sound of a seat belt warning could be heard in HUBBART's vehicle indicating that he had just

departed **409 Lafayette Road, Holly Hill, SC**, which was corroborated by the geo-location data

of TARGET TELEPHONE 11. The following is a transcript of a portion of the intercepted

communication:

HUBBART: Yo.

69

ME

HAYNES: Yeah.
HUBBART: U/I on Friday night. Them boys locked in. The bitches be out there when them boys U/I to.
HAYNES: Yeah?
HUBBART: Hell yeah. U/I be careful up in there, them niggas look like U/I, all them look like U/I. And they know they new, all them niggas look at you and be like 'what's up man,' all them boys want to see what's up.
HAYNES: Damn boy.[29]

85.    On June 28, 2019 at approximately 9:10 a.m., HUBBART, using TARGET TELEPHONE 11, received an incoming call from EDWARDS, using TARGET TELEPHONE 13. The following is a transcript of a portion the intercepted communication:

HUBBART: Whats up Joe?
EDWARDS: Mornin'
HUBBART: Whats happening?
EDWARDS: Everything good. Everything good man?
HUBBART: Yeah, everything good.
EDWARDS: Awake this morning.
HUBBART: Right.
EDWARDS: MmmHmm. The General say him about to send off the thing, but your thing gonna make the next route. Ya hear?
HUBBART: Alright.
EDWARDS: Him say it's supposed to get there tomorrow. You hear?
HUBBART: Got you. Alright.
EDWARDS: Yeah man. You know what I'm talkin about?
HUBBART: Yeah, yeah, I got ya.
EDWARDS: Tell Joe, make Joe know, see if him get that from you. You hear?
HUBBART: Alright.
EDWARDS: Just call the man, make him know see if it does bloodclaat get there.
HUBBART: I gotcha.
EDWARDS: Yeah man, you know, just, just me tell... You see the Dread yesterday?
HUBBART: Yeah, yeah, I did.
EDWARDS: What did you tell him?
HUBBART: Umm, he was sleeping matter of fact. I know he been asleep, I give him the bag and then I left.
EDWARDS: You just give it and left?
HUBBART: Yeah, yeah, I give him the bag and left, yeah.
EDWARDS: No problem, it's good. No problem. Yeah. No problem. You know, him...

86.    On July 4, 2019 at approximately 8:12 a.m., HUBBART, using TARGET

---

29 Based on intercepted communication, my experience in this case and my training, I believe "choppers" is common street slang for assault style rifles, most commonly AK-47.



TELEPHONE 11, made an outgoing call to EDWARDS, using TARGET TELEPHONE 13. The

following is a transcript of a portion of the intercepted communication:

EDWARDS:  Hey?
HUBBART:  Yo?
EDWARDS: Yo!
HUBBART:  Yeah I changed the birthday and I talked to the boy.   The boy say he just
got an ounce of gelato, he say he has an ounce of the gelato left.   He said he aint, we
wasn't supposed to take into that on, he thought he gave, he thought he supposed to give
me the U/I and one gelato.
EDWARDS:  What's that?
HUBBART:  He thought he was supposed to just give me the two platinum and one
gelato.   You know what I'm saying?   I tell him all I did was just take the thing up there
to uh, you know what I'm saying to the Dread like I ain't U/I, he still got an ounce of the
gelato left that's it?
EDWARDS:  So what him doin, sell it?
HUBBART:   Yeah he was sellin it, that what he was doin, yeah. And he told me, I told
him the price was 24.   Now I don't remember that shit, but, yeah.
EDWARDS:  U/I, look here u/I, I know man, I tell the Dread man, if somebody who
what you deal with man, you tell the Dread it's two thing.   It's that it left back in your
truck or you left at your house. But tell him you leave behind you, you always have it.
Me tell the Dread the other day, give me back 7 fuckin thousand you have in your truck.
Cause I'm gonna go to New York, you find all your fuckin money, cause you go and
check back and you send the fuckin money for the man.   Me tell him a one person, never
take a dollar from me.   It's you.
HUBBART:  Yeah.
EDWARDS:  U/I look here.   Everything the Xman want, he can ask me and I give it to
you.   I tell him say look here, U/I get three and ask for him forget.   Me tell him straight
up, me have my reason say look here.   I gonna tell you about this kid.   You say U/I ten
thousand, and you carry $8000 you tellin me short, you go back and you get the two
thousand.   Don't care what it is, it always current and I never got a problem with him and
some mistake happen man, you know?
HUBBART:  Yeah yeah.
EDWARDS: U/I look here, him don't know you, U/I. You know man, go.
HUBBART:  Yeah, yeah.
EDWARDS:   And you don't play around.   Cause it have to be some mistake happen. So
all you have to do is just wait til you come back and collect the 24 from that boy.
HUBBART:   Right
EDWARDS:   Just wait til you collect the 24 from that boy and just carry it there and
give to Dread.
HUBBART:  I gotcha.
EDWARDS:   Listen to me now.
HUBBART:  Yeah
EDWARDS:   Cause you go up there, ya box it out. U/I real good box and the next one
u/I at the price for them on the next one.   So time you go up there, you make him box it
out.



HUBBART:  gotcha
EDWARDS:  Alright then I can tell him the price.
HUBBART:  Uhm, quick question Joe, how much he got all together for me to grab?
EDWARDS:  Uhmm..Where, up here?
HUBBART:  Yeah, he already he already got that situation right?
EDWARDS:  Yeah, him have that situated.  Time you go up there.
HUBBART:  I gotcha.
EDWARDS:  Alright, look here now.  Him owe you eight thousand, right?
HUBBART:  Yeah
EDWARDS:  Him owe you nine, nine and the one thousand two hundred cause you have the three box up there.
HUBBART:  Right.
EDWARDS:  So you put the one thousand two hundred one side.  Right?
HUBBART:  Yeah.
EDWARDS: One thousand two hundred one for that he owe you the remainder for the four, right?
HUBBART:  Yeah, gotcha.
EDWARDS:  And him supposed to give you a little thing for yourself.  It's what I'm sayin to you.  Cause him carry the stuff up there U/I gonna bless you.
HUBBART:  Right, right.
EDWARDS:  So that's a whole different thing.  Listen what I'm sayin to you.
HUBBART:  Gotcha.
EDWARDS:  So with the three packs, its, is time you go up there, tell him give you the remainder money and then give you money for the three packs up there and you don't know what happened, cause the next packs down the road.
HUBBART:  Alright
EDWARDS:  And that's it.  And just leave that to him.
HUBBART:  Alright now with that one that you sittin aside, the one that's not that good.  Do I keep that or he keep it?
EDWARDS:  Which one?
HUBBART:  The one that you said inside this pack right here that ain't no good like that.
EDWARDS:  Eh, you don't wanna keep one pack outta that?
HUBBART:  yeah cause I know the lil dude who who gonna take down the one, he gonna need something until you know what I'm sayin, until Monday or something.
EDWARDS:  Alright listen what you do now.  If you sellin u/I dude who want one, right?
HUBBART:  yeah
EDWARDS:  You break that pack.  Give him one outta there, wait a sec.  He break down?
HUBBART:  Yeah, he break down. Yeah
EDWARDS:  Alright, give him the worst pack.
HUBBART:  Ok.
EDWARDS:  And tell him say you give him, you know what I'm sayin to you.  Tell him, say you not gonna give him for twenty four.  Give him the worst pack out of it.  One of them, look on them. One of them mix up. Break the pack then, break it up.  You have the one pack, it it it kinda mix up.  Just give him that pack and tell him to U/I through the holiday.  Tell him you give him bread.  Two hundred dollars off that pack



for you.   And tell him just give me 18 for that box.

HUBBART:   I gotcha.   Alright.

EDWARDS:   Just tell him just to give me, look here.   Tell him say you want 20 for that. Look here.   Look on the packs, u/I three of them is solid. You gonna carry them to the dread.   The one that look like it mixed up, just tell him say yo, you tell him just give me 8 hundred dollar for that pack and we work it out.

HUBBART:   Gotcha.

EDWARDS:   Just tell him.   Give me 8 hundred, 18 hundred dollars for that pack.

HUBBART: I gotcha.   Alright.

EDWARDS:   That means so what, cause you know I not gonna squeeze, I gonna make him make a change cause I didn't see your people.

HUBBART:   I gotcha.

EDWARDS:   You know what I'm sayin to you?   So you got two packs and we box them and look through them and the solid one then, and the one that gotta little, you say the one you give him...

HUBBART:   Yeah

EDWARDS:   You can give him at least two thousand.   That means you get a...cause hear what happen now.   We got some real good shit tonight and it have some really good shit tonight so it mixed up.

HUBBART:   I gotcha, alright.

EDWARDS:   But the solid packs, man, I want you to give the Dread the solid one then.

HUBBART:   Ok.

EDWARDS:   Look straight, my man.

HUBBART:   Alright.

87.     On July 4, 2019 investigators conducting surveillance of HUBBART observed him leave the Summerville, SC area in his silver Dodge Durango at approximately 12:41 p.m. Surveillance was maintained as HUBBART travelled to **409 Lafayette Road, Holly Hill, SC**. When HUBBART departed the residence at approximately 1:20 p.m. and travelled to Highway 453 in Holly Hill, SC., a police tahoe patrolling the area pulled behind HUBBART. Investigators observed HUBBART quickly turn from the roadway into the United gas station where HUBBART waited for the law enforcement vehicle to depart from the area. Surveillance was maintained as HUBBART left Holly Hill, SC and traveled toward the Charleston, SC area. At approximately 2:17 p.m., surveillance observed HUBBART return to his residence at **234 Miami Street Lot 20, Ladson, SC**.

88.     On July 9, 2019, United States Magistrate Judge Bristow Marchant, District of



South Carolina, authorized a warrant for the geo-location information of TARGET TELEPHONE 11 and TARGET TELEPHONE 18, both used by HUBBART, for a period of 30 days. On this same date, DEA began receiving geo-location information of TARGET TELEPHONE 11 and TARGET TELEPHONE 18.

89.    An analysis of the geo-location data of TARGET TELEPHONE 11 and TARGET TELEPHONE 18 indicated HUBBART travelled to **409 Lafayette Road, Holly Hill, SC** on July 9, 2019 and again on July 18, 2019. However the geo-location data of TARGET TELEPHONE 18 indicated that the telephone remained at **409 Lafayette Road, Holly Hill, SC** when the geo-location data of TARGET TELEPHONE 11 indicated that HUBBART returned to **234 Miami Street Lot 20, Ladson, SC**. HUBBART carried TARGET TELEPHONE 11 while completing his FedEx route on July 19, 2019 and the returned to **409 Lafayette Road, Holly Hill, SC** after work. After HUBBART visited **409 Lafayette Road, Holly Hill, SC** on July 19, 2019, the geo-location data of both TARGET TELEPHONE 11 and TARGET TELEPHONE 18 indicated that HUBBART had likely left TARGET TELEPHONE 18 at the residence in Holly Hill, SC as both TARGET TELEPHONES indicated that returned to **234 Miami Street Lot 20, Ladson, SC**.

90.    On July 11, 2019 DEA received information from a source of information (SOI-1)[30] that a subject from Florida with a felony conviction(s) is transporting firearms, including AK-47 and other assault rifles to Holly Hill, SC where the firearms are being sold by FNU LNU a/k/a "Dread." SOI-1 explained that FNU LNU a/k/a "Dread" is also responsible for distributing a large amount of drugs in Holly Hill, SC and described FNU LNU a/k/a "Dread" as an older black male,

---

30 SOI-1 has been convicted of unlawful carry of a firearm and resisting arrest (1998), giving false information to a police officer and driving under suspension (1999), conspiracy to distribute cocaine (2002), unlawful use of a telephone and criminal domestic violence (2008), shoplifting (2012), and possession with the intent to distribute cocaine (2015). Information provided by SOI-1 has been corroborated through subpoenas, and indices checks, and surveillance and thus, has been deemed credible. SOI-1 has provided substantial assistance in previous drug investigations and has prepared to testify in those investigations.



skinny with dreadlocks and gold teeth. According to SOI-1, FNU LNU a/k/a "Dread" is from Jamaica and was involved with a previous drug investigation by DEA. After receiving this information, DEA contacted the South Carolina Law Enforcement Division (SLED) on July 19, 2019 in an attempt to identify FNU LNU a/k/a "Dread." SLED and Berkeley County investigators identified FNU LNU a/k/a "Dread" as Lebert FRAZER and described that a previous SLED investigation revealed that FRAZER distributes drugs and firearms from **409 Lafayette Road, Holly Hill, SC**. A query of the South Carolina Department of Motor Vehicles revealed that Lebert FRAZER is a 59 year old black male with dreadlocks and provided his address for his driver license as **409 Lafayette Road, Holly Hill, SC**. A query of FRAZER's criminal history and immigration record revealed that FRAZER was born in Jamaica.

91.    Based on the intercepted communications, confidential sources and cooperating defendants, physical surveillance as well as my experience in this case and my training, I believe FNU LNU a/k/a "Dread" is distributing drugs for the DTO and evidence of FNU LNU's a/k/a "Dread's" participation with the DTO will be found at **409 Lafayette Road, Holly Hill, SC**. I also believe that FNU LNU a/k/a "Dread" uses **409 Lafayette Road, Holly Hill, SC** to conceal records of his criminal activity because FNU LNU a/k/a "Dread" is a large scale distributor for the DTO. I believe FNU LNU a/k/a "Dread" uses **409 Lafayette Road, Holly Hill, SC** to primarily store drugs and as such books, records, receipts, notes, ledgers and other papers relating to the cost of, and profits from, ordering, purchasing, transporting and distributing drugs, in particular marijuana will be found there. I believe FNU LNU a/k/a "Dread" resides at **409 Lafayette Road, Holly Hill, SC**, and as such based upon my training and experience, I believe that drug proceeds as well as records, receipts, ledgers and other documents or records relating to the shipment transportation or delivery of U.S. currency, drug-related proceeds or assets by wire, courier or other means will be found there. I believe that an indicia of occupancy, residency, rental and /or ownership of **409**



Lafayette Road, Holly Hill, SC or of any vehicles or other conveyances; including, but not limited to, utility and telephone bills, rental, purchase or lease agreements, titles, registration documents, and keys as well as the telephones used by FNU LNU a/k/a "Dread" will be found at **409 Lafayette Road, Holly Hill, SC**. Additionally, based specifically upon several intercepted conversations, I believe FNU LNU a/k/a "Dread" stores firearms and ammunition, as well as papers, documents, records and/or receipts pertaining to the possession or ownership of firearms and ammunition at **409 Lafayette Road, Holly Hill, SC** [reference paragraphs 84 and 90].

## JULY 12, 2019 SEIZURE OF US CURRENCY

92.      On June 24, 2019 at approximately 4:30 p.m., HUBBART, using TARGET TELEPHONE 11, made an outgoing call to EDWARDS, using TARGET TELEPHONE 13. The following is a transcript of the intercepted communication:

> EDWARDS:   Text the General number to Keith. Ok?
> HUBBART:   Alright.
> EDWARDS:   Him say, he, you thought it was a lot of money gonna carry down there to me. You know. So, him say I'm gonna scrape up, I'm not gonna lie to you now, a few. So, he call you? He call you back?
> HUBBART:   Yeah, I had call him.
> EDWARDS:   Yeah. Text the General number to him and ask him if he get it. And hear what him say to you.
> HUBBART:   Alright.
> EDWARDS:   Time you text it to him ask him if he get it.
> HUBBART: Alright.
> EDWARDS:   And hear what he reply to you.
> HUBBART:   Alright.31

93.      On June 24, 2019 at approximately 8:46 p.m., HUBBART, using TARGET TELEPHONE 11, made an outgoing call to EDWARDS, using TARGET TELEPHONE 13. The following is a transcript of the intercepted communication:

> EDWARDS:   What's up?
> HUBBART:   What's up Joe?

---

31 Based on the intercepted communication, my experience in this case and my training, I believe that EDWARDS was directing HUBBART to contact CHISHOLM to collect drug proceeds to be transported to ECCLESTON by EDWARDS.



EDWARDS:   I know the boy Keith done call you.
HUBBART:   You say he called me?
EDWARDS:   He didn't call you?
HUBBART:   Let me check my phone. I don't think he did.
EDWARDS:   Yeah?
HUBBART:   No, he ain't call me.
EDWARDS:   He didn't call you?
HUBBART:   No, he ain't call or text.
EDWARDS:   What he was trying to say to you?
HUBBART:   Um, he was just saying he ain't got a good bit a change for me to come up there and get and what not and he trying to scrape some change up now, was all he been saying. I guess that when you been calling in or he say he was bout to call you or something like that. That's all he been sayin.
EDWARDS:   But he told me you was supposed to come and see him so why he sayin all of that?
HUBBART:   I ain't know. Cause I tell him, I tell him I be on my way. He be like, Nah. He tell me straight up. I been like what do you mean, Nah. He be like, I ain't even got it together yet.
EDWARDS:   He told me that he got it from ones that gone. That's why I say it, ya know?
HUBBART:   He say what now?
EDWARDS:   He told me he got the money from ones that gone and I told him, you know I'm not there, I'm up in New York.
HUBBART:   Right right right. I ain't even know Joe. I tell him I was coming to get it or was going to meet half way.   Whichever one, it ain't matter.
EDWARDS:   You talked to the Dread?
HUBBART:   No, I ain't talked to him yet.
EDWARDS:   Ok.
HUBBART:   He already got it together?
EDWARDS:   His money? Dread? Up top?
HUBBART:   Yeah. Up there, yeah.
EDWARDS:   Yeah, man. Just go up there. Call him up and say you are coming.
HUBBART:   Alright.
EDWARDS:   Just call him and tell him.
HUBBART:   Say it again.
EDWARDS:   Call him and say you coming.
HUBBART:   Alright.
EDWARDS:   Say no more.[32]

---

32 Based on the intercepted communication, my experience in this case and my training, I believe that EDWARDS was directing HUBBART to contact CHISHOLM to collect drug proceeds. Additional intercepted communications indicate that EDWARDS was planning to come to South Carolina to collect the proceeds from CHISHOLM, JEFFERSON, HUBBART, JAMES and FNU LNU a/k/a "Dread" before transporting the proceeds back to California.



94.    On the evening of June 24, 2019 CHISHOLM was observed leaving **162 Jenkins Road, Yemassee, SC** and travel to Bull Corner Road in his white Honda Accord. Surveillance teams began following CHISHOLM but discovered that CHISHOLM was conducting counter surveillance maneuvers and returned back to **162 Jenkins Road, Yemassee, SC**. At approximately 7:38 PM, CHISHOLM was observed leaving **162 Jenkins Road, Yemassee, SC** in the white Honda Accord travelling back to US 17 and conducting another series of counter surveillance maneuvers before returning back to **162 Jenkins Road, Yemassee, SC**. Based on the intercepted communications between EDWARDS and HUBBART detailing that CHISHOLM was still in the process of collecting drug proceeds, I believe that CHISHOLM was attempting to travel to collect drug proceeds or was transporting drug proceeds from within **162 Jenkins Road, Yemassee, SC** and was attempting to avoid surveillance.

95.    Toll analysis of TARGET TELEPHONE 18, revealed that HUBBART, using TARGET TELEPHONE 18 was communicating with CHISHOLM, using TARGET TELEPHONE 17 from June 21 through June 24, 2019.

96.    On June 25, 2019 at approximately 4:20 p.m., HUBBART, using TARGET TELEPHONE 11, made an outgoing call to EDWARDS, using TARGET TELEPHONE 13. The following is a transcript of the intercepted communication:

> EDWARDS: Hey!
> HUBBART: Hey Joe, you want me to, you want me to hand both of these things over?
> EDWARDS: Oh, what you say?
> HUBBART: I said you want me to hand both of these boxes to Family (JAMES)?
> ELLIS: (in background) Noooo!
> EDWARDS: No, the one with the four.
> HUBBART: The big one? I got you.
> EDWARDS: Yes, and the youth want one out of that one.
> HUBBART: Alright.
> EDWARDS: Yeah, I got the problem changing the money man. I go over there and they want 109 dollars to change 1,000 dollars man. I gotta try somebody else man.
> HUBBART: Alright.
> EDWARDS: I got to, yeah. Look here…

79



> HUBBART: Yo?
> EDWARDS: Yeah, I come back to pick up the money.
> HUBBART: Huh?
> EDWARDS: The Dread say you gotta pick up the money from Family (JAMES) later on.
> HUBBART: Ok, alright.
> EDWARDS: Yeah and the Dread say to hollar at him. You hear?
> HUBBART: I got you.
> EDWARDS: Alright.
> HUBBART: Alright33

97.     On the evening of June 24, 2019 at approximately 10:30 p.m., HUBBART traveled to the Holly Hill, SC area for the purpose of collecting drug proceeds from FNU LNU a/k/a "Dread." HUBBART's silver Dodge Durango was observed at **409 Lafayette Road, Holly Hill, SC** and the location of TARGET TELEPHONE 11 indicated that HUBBART was in the same area. Based on the intercepted communication, I believe that HUBBART delivered a parcel to FNU LNU a/k/a "Dread" at **409 Lafayette Road, Holly Hill, SC** and picked up drug proceeds that would later be given to EDWARDS by HUBBART.

98.     On June 27, 2019 at approximately 12:00 p.m., HUBBART, using TARGET TELEPHONE 11, received an incoming call from EDWARDS, using TARGET TELEPHONE 13. The following is a transcript of the intercepted communication:

> HUBBART: What's up Joe?
> EDWARDS:   Yeah. Hmm. So you give him the thing?
> HUBBART:   Yeah, yeah, I sent it to him.
> EDWARDS: Okay. You don't know what time it is you know?   Where that concerned and tell it to you I gonna go to New York on Sunday.
> HUBBART: Right, right.
> EDWARDS:   So you know...you know when the bus leave, you know it's in the night.
> HUBBART:   Right, yeah.
> EDWARDS:   Yeah so I gonna try to get up there in the morning. Cause you know I gotta catch a flight to get up there in the morning.
> HUBBART:   Alright.
> EDWARDS:   Cause it leave on Sunday night, right?

---

33 Based on the intercepted communication, my experience in this case and my training, I believe that HUBBART has 2 FedEx parcels on his truck that contain drugs sent by the DTO and is asking EDWARDS who to deliver each parcel to. EDWARDS directs HUBBART to deliver drugs to JAMES a/k/a "Family" and to contact FNU LNU a/k/a "Dread" to collect drug proceeds.



HUBBART:   Yeah yeah, the ones that I be seeing. Like every time I take somebody there it leave on a Sunday.

EDWARDS:   Every time you take somebody there it leave on a Sunday?

HUBBART:   Yeah, yeah like when I...

EDWARDS:   I don't want to leave from that stop no more I wanna leave from the other stop up top.   I don't like that stop.

HUBBART: I gotcha. I gotcha.

EDWARDS:   That stop is too much people in that area man.

HUBBART:   Right, right, right.

EDWARDS:   You got stop otherwise at the top, u/i that?

HUBBART:   Yeah they do. Yeah, I think the niece had booked that one.

EDWARDS:   Huh?

HUBBART:   I said I think your niece had booked that stop right there.

EDWARDS: I can't hear you.

HUBBART:   I said I think your niece had booked that stop right there.

EDWARDS:   Run that by me again

HUBBART:   Hold on. I said I think your niece had booked that stop right there.

EDWARDS:   Yeah, I know. I know. But we not gonna do that one, man, but that's what I say to you man.   Right now, we have to try to push it and I can't let these boys know about this shit man.

HUBBART:   Got you.

EDWARDS:   Cause you don't see what them up to. That's why I tell you.   You know what I'm saying. I gonna send that thing over there and hey...you don't know...the going price over there so you know try to get a total..they 34 over here so for you give the General 33 you know you up and running.

HUBBART:   Got you alright

EDWARDS:   You just take a thousand off of each one. Cause you know it's 34 so we gonna see if we can pitch 2, and you just get 33-33, and just run it up the road okay?

HUBBART: Alright. Gotcha.

EDWARDS: That means that you still get a thousand outta that for each one to run around.   Cause what I say to you, you don't know me, I like how you make your money.

HUBBART:   Right, right.

EDWARDS:   So I don't like to fuck with those boys.   I tell you those boys will do everything to fuck you up.   Trust me.

HUBBART:   Yeah (laughing)

EDWARDS: No. For real, for real!!   Remember it's not none of them that need you. You have to acknowledge that. Hello?

HUBBART:   Yeah, I here.   Yeah, I gotcha.

EDWARDS:   What I tellin you sir, is none of them need you.   You know what I'm sayin to you?

HUBBART:   Yeah right right.

EDWARDS: So you don't know.   You don't let nobody fuck up that. No for real for real. So you go and make your call for now and make sure for everything been working. Cause you know it gotta get over there.

HUBBART:   Alright.   I'm gonna do that

EDWARDS:   Yeah man just do what you have to do man and then, you know?

HUBBART:   I gotcha.



EDWARDS:  I do what I have to do.  Alright
HUBBART: Alright
EDWARDS: Did you send it to him already?
HUBBART:  Yeah I sent it to him.
EDWARDS:  Alright no problem.  No problem.  Everything good.  But look here my man.  Make your call and make anybody who want it put in their order.
HUBBART:  I gotcha. I'm gonna do that right now.
EDWARDS:  No for real, but you know what comin to you.  So you have to put everything in respective way.  Cause I wanna go to New York so you know we have to try to get rid of them and let me go up top.
HUBBART:  Alright.  I'm gonna do that.
EDWARDS: It's not gonna be one of them. I think it's two.
HUBBART:  Gotcha.
EDWARDS:  Hear?
HUBBART:  Yeah I heard ya, yeah
EDWARDS:  Alright.  So get working and...alright.34

99.    On June 29, 2019, HUBBART met with Wayland PARKER, a USPS carrier in North Charleston, SC and received a USPS parcel that I believe contained approximately 2 kilograms of cocaine sent at the direction of EDWARDS and ECCLESTON from JNC Shipping and Office Supplies at 8013 Archibald Ave in Rancho Cucamonga, CA, based on the shipping address, previous intercepted parcels that contained drugs and intercepted calls.

100.    On June 30, 2019 at approximately 11:22 a.m., HUBBART, using TARGET TELEPHONE 11, received an incoming call from EDWARDS, using TARGET TELEPHONE 13. The following is a transcript of the intercepted communication:

EDWARDS:   Yeah, but General say he will look into your thing and him say he will give me a talk one day this week.
HUBBART: Alright.
EDWARDS:   He say them people have it you know, but he want to check out the numbers and everything. He not gonna say 'yes' till he know the number.
HUBBART: I gotcha.
EDWARDS: And that they got it. That's so you can tell somebody something.
HUBBART: I gotcha, alright.

---

34  Based on the intercepted communication, my experience in this case and my training, I believe that EDWARDS is describing to HUBBART that he wants to arrive in Charleston, SC and collect drug proceeds from CHISHOLM, JEFFERSON, HUBBART, JAMES and FNU LNU a/k/a "Dread" and then quickly depart on a bus destined for New York where he will arrange for the drug proceeds to be ultimately paid to ECCLESTON. I believe that EDWARDS planned to accomplish this through the use of couriers on commercial or private aircraft or through a hawala, an alternative criminal money remittance channel that exists outside of the traditional banking system.



EDWARDS:   But what he said man, he said, as I told you before, knock the shit out at the price so I can come up there and run the things to New York. That's so we can get something next week.

HUBBART: Gotcha, ok.

EDWARDS:   Cause here what happened now... Joe and Family out of this... Me tell you, you see my word? You see what I tell you about my word, my word is everything. You see what I'm saying to you? Joe did supposed to get something but he fucked up that money in the mail. And Family were to get something, but all that money fucked up. So what I told the General to do, ok, do nothing else more than what happened.   Thats why I sent it to you, cause I already tell you what I was gonna do 2 weeks ago.

HUBBART: Appreciate it.

EDWARDS: You got it?

HUBBART: Yeah I got it.

EDWARDS: Isn't that what I told you I was gonna do?

HUBBART: Hh huh

EDWARDS:   I told you I was going to get 2 ice cream to you.

HUBBART: Right

EDWARDS: And you see what I'm saying to you? Thats what I told you.

HUBBART: Yeah.

EDWARDS: And look here... with the money, the time I will come up there I want to go through the money real good, cause the guy who's gonna carry the money here...

HUBBART: MmmHmm

EDWARDS: You don't know whats gonna happen... he's gonna fucking count it, and here what happened now. The time you come to the hotel...

HUBBART: MmmHmm

EDWARDS: We just gonna get a room and we will go through everything and count every fucking thing. You hear?

HUBBART: Alright.

EDWARDS: That means the time it go there, we don't have to deal with him counting nothing, we don't have to, we be on the same page.

HUBBART: Gotcha. Alright.

EDWARDS: Cause that's how we have to do business. Cause I don't want him to think 'well my people are (Unintelligible) cause they say this is all they got.' Listen to what I'm saying to you. They can take my face off, cause that what they do the other day. Listen to what I'm saying to you, cause we are grown ass man sit down there (Unintelligible) and I don't appreciate that.

HUBBART: I gotcha.

EDWARDS: No for real, for real. Listen to what I'm saying to you. I don't want to flaunt it around nobody who gonna do the right thing. I want to do the right thing and get the right results.

HUBBART: Gotcha

EDWARDS: So the General ask me, when, which day do you think everything is gonna be ok, Cause I don't want to come up there, I want to come for today, we go through, and I jump on the thing.   I want to come in the morning, and leave in the night.

HUBBART: I got you, alright. Let me...

EDWARDS: So tell me which day. That way I can make her book the ticket. She gonna book the ticket after the ice cream money. So that I can come up there.



HUBBART: I'll let you know, I'm waiting on this guy to call me back right now.
EDWARDS: Uh huh, ok. Well just do what... its the weekend now, you know its Labor day and coming up and all this shit.
HUBBART:  Right, right.
EDWARDS:   So you want to get the right fucking price, That's so you can make your money.
HUBBART:  Got you.
EDWARDS: You have to get the right, cause its holiday. Ain't nothing down there. So you tell that mother fucker take your way or the highway.   Listen to what I'm saying to you?
HUBBART: Yeah.
EDWARDS: So if I can come down there in the holiday, and take it up there its good, because thats when everybody is traveling. So if I can leave Wednesday night and come there Thursday and adios... thats good for me.
HUBBART: I gotcha.
EDWARDS:   If I can come before the holiday, I come before the holiday. It don't matter. I just want to get it out the way so we can get something next week.
HUBBART: Alright.
EDWARDS: Alright.35

101.    On July 4, 2019 at approximately 8:08 a.m., HUBBART, using TARGET

TELEPHONE 11, made an outgoing call to telephone number 800-323-2323, Delta Airlines.

HUBBART called the automated Delta system about an existing reservation for "his grandfather."

HUBBART stated that he put in the wrong birthdate for him. HUBBART provided the

Confirmation Number as "GSBLCJ" and the name as "Kevin BELL" with travel from Sacramento,

CA to Charleston, SC. HUBBART stated that May 18, 1963 is the correct birthdate. EDWARDS

has a South Carolina drivers license in the name Kelvin BELL with that same date of birth that

investigators believe was obtained through fraudulent documents.

---

35 Based on the intercepted communication, my experience in this case and my training, I believe that EDWARDS begins the conversation telling HUBBART that ECCLESTON was working on the heroin that HUBBART requested in an intercepted communication that occurred on June 27, 2019. EDWARDS then continued to plan his trip to Charleston, SC and collect drug proceeds from CHISHOLM, JEFFERSON, HUBBART, JAMES and FNU LNU a/k/a "Dread." EDWARDS also confirmed that he arranged for HUBBART to receive "2 ice cream" from ECCLESTON. I believe that EDWARDS was referring to 2 kilograms of cocaine that HUBBART received in the USPS parcel from PARKER on June 29, 2019.



102.    On July 4, 2019 at approximately 9:29 a.m., HUBBART, using TARGET

TELEPHONE 11, received an incoming call from EDWARDS, using TARGET TELEPHONE

13. The following is a transcript of the intercepted communication:

> HUBBART:  What's up Joe?
> EDWARDS:  Yeah, you don't leave yet to the Dread right?
> HUBBART:  No, no, not yet.
> EDWARDS:  Alright.  We gonna do something this morning.  Don't leave right as yet.
> HUBBART:  Alright.
> EDWARDS:  Hear what happen now.  We gonna do this.  This morning cause you know I wanna get the shit off to go up the road.
> HUBBART:  Right right.
> EDWARDS:  This is what we gonna do this morning.  You gonna call Family.  Listen what you gonna do. You gonna call him.  Tell him say the people gonna bring it to you, and line up that thing over there...
> HUBBART:  Joe, I can't hear you.  Say it again.
> EDWARDS: What I'm sayin to you.   You gonna make him come to you with the money and everything. And then you give him the one.   You gonna make him come, make him come 33, you give him the fuckin one.
> HUBBART:  Alright.
> EDWARDS:  You see what I'm sayin to you?
> HUBBART:  Hmmm hmm.
> EDWARDS: And then him say the next one now, he gonna break it down and give you the rest of the money before you leave.  So hear what happen now.  You tell him people come deliver so you tell him the people have one right now and before you leave...you gonna leave today to go outta town, right?
> HUBBART:  Yeah yeah yeah.  Later on today.
> EDWARDS:  What time you gonna leave?
> HUBBART:  Later on today.  Yeah, probably like six o'clock.
> EDWARDS:  So I gonna call him back. Don't move. Cause the Dread is last priority. Okay?
> HUBBART:  Gotcha.[36]

103.    On July 4, 2019 at approximately 11:30 a.m., surveillance observed HUBBART

travel to **208 Louie Lane, Ladson, SC** and park his silver Dodge Durango on the street behind

JAMES' silver BMW 745. HUBBART remained at **208 Louie Lane, Ladson, SC** until

---

[36] Based on the intercepted communication, my experience in this case and my training, I believe that EDWARDS was directing HUBBART to take one of the kilograms of cocaine to JAMES and collect $33,000 in drug proceeds from JAMES. EDWARDS wanted to add these drug proceeds to what he planned to collect and transport from South Carolina to California. Surveillance of HUBBART observed HUBBART travel from his residence to JAMES' residence in Ladson, SC and park on the street behind JAMES' vehicle.



approximately 11:53 a.m. when he departed JAMES' residence and returned to **234 Miami Street Lot 20, Ladson, SC**.

104.    On July 4, 2019 at approximately 12:30 p.m., HUBBART, using TARGET TELEPHONE 11, made an outgoing call to EDWARDS, using TARGET TELEPHONE 13. The following is a transcript of the intercepted communication:

EDWARDS:  Hey.
HUBBART:  Yo?
EDWARDS:  Yeah.
HUBBART:  What's up, man?
EDWARDS:  What, you alright?
HUBBART:  Yeah, I good.
EDWARDS:  Oh, ok. Well, him say him take care of business. You count the money?
HUBBART:  No, I about to head back over there now.
EDWARDS:  You say he give, he didn't give you the money?
HUBBART:  No, I'm talking about I'm about to head back over there now.   If he, he want the other one?   That what he asking about?
EDWARDS:  No, no, no.   Listen to me.   Do you see him put it on the scale and everything?
HUBBART:  Yeah, yeah, yeah.
EDWARDS:  Huh?
HUBBART:  Yeah.
EDWARDS:  You know...
HUBBART:  All that good. He had his peoples over there so I had him take care of it while I sat outside.   I.......
EDWARDS:  No, listen to me. You see him put the shit on the scale?
HUBBART:  Who um, Family?   No, he already, he already been dealing with that already.
EDWARDS:  So him say you see him put that shit on the scale and the shit short an ounce?
HUBBART:  Oh no. Oh no. I bout to call him now. Fuck he talking about?
EDWARDS:  No, listen to me. Listen to me. Him say everything gonna work though, listen to me now. Time him give you that money and you go over there, you want this one cut and put on the scale before you leave, you hear?
HUBBART:  I got you. Alright.
EDWARDS:  No. For real, for real. You go over there, you call me.
HUBBART:  Alright.
EDWARDS:  You get the money and count the money, you call me.
HUBBART:  Got you.
EDWARDS:  You don't carry the next one, go and give him and don't get out of the truck until you count up the money and you call me. And you get the next one and cut it and put it on the scale right there. You hear?
HUBBART:  Alright.



EDWARDS:  Alright.37

105.    Toll analysis of TARGET TELEPHONE 18 revealed that HUBBART, using TARGET TELEPHONE 18 was communicating with JAMES, using TARGET TELEPHONE 15 on July 4, 2019.

106.    Based on the Delta Airlines Confirmation Number intercepted on July 4, 2019 agents identified that EDWARDS would be arriving at the Charleston International Airport from Sacramento, CA on Delta Airlines flight DL1350 on July 9, 2019 at approximately 10:44 a.m. Surveillance was established and identified EDWARDS departing the flight and walking through the airport carrying one black roller suitcase. EDWARDS was picked up at the airport by JAMES who was operating a rented SUV registered to Enterprise Rental. Enterprise provided that the vehicle was rented by Tashawna Broughton with an address of **208 Louie Lane, Ladson, SC**. Bases on previous surveillance I believe Tashawna Broughton to be JAMES' wife. Surveillance of JAMES and EDWARDS was maintained and they travelled to JAMES' residence at **208 Louie Lane, Ladson, SC**.

107.    On July 9, 2019 United States Magistrate Judge Bristow Marchant, District of South Carolina authorized an Order authorizing the geo-location of TARGET TELEPHONE 13 used by EDWARDS, TARGE TELEPHONE 11 and TARGET TELEPHONE 18 used by HUBBART, TARGET TELEPHONE 15 and TARGET TELEPHONE 16 used by JAMES and TARGET TELEPHONE 17 used by CHISHOLM.

108.    On July 10, 2019 at approximately 1:00 p.m., the geo-location of TARGET TELEPHONE 11, TARGET TELEPHONE 13 and TARGET TELEPHONE 18 indicated that both

---

37 Based on the intercepted communication, my experience in this case and my training, I believe that JAMES explained to EDWARDS that the kilogram of cocaine delivered by HUBBART weighed an ounce less than it should. EDWARDS directed HUBBART not to deliver a second kilogram of cocaine to JAMES without collecting the drug proceeds from the sale of the first kilogram.



EDWARDS and HUBBART were at the TownPlace Suites by Marriott located at 7535 North Side Dr in North Charleston, SC. At approximately 1:35 p.m., agents observed HUBBART, wearing his FedEx uniform, walking from the hotel carrying a back pack and enter his silver Dodge Durango. At approximately 1:10 p.m., investigators observed CHISHOLM'S white Honda Accord and burgundy GMC Sierra along with Rodrick CHISHOLM'S black Cadillac Escalade parked at **162 Jenkins Road, Yemassee, SC**. The location of TARGET TELEPHONE 17 at approximately 1:14 p.m. indicated that CHISHOLM was located at **162 Jenkins Road, Yemassee, SC**. Later that afternoon surveillance observed CHISHOLM travelling in his white Honda Accord to several residences that were identified during the interception of TARGET TELEPHONE 4 to be used by CHISHOLM and others to distribute cocaine supplied by the DTO. CHISHOLM's activity was consistent with the collection of drug proceeds that was observed during the interception of TARGET TELEPHONE 4. The location of TARGET TELEPHONE 17 indicated that CHISHOLM returned to **162 Jenkins Road, Yemassee, SC**. Later on in the evening, TARGET TELEPHONE 17 indicated that CHISHOLM travelled to the Summerville, SC area. Surveillance of **162 Jenkins Road, Yemassee, SC** indicated that he departed the residence in his burgundy GMC Sierra bearing South Carolina license plate "QVG238." A query of the South Carolina Department of Motor Vehicles revealed license plate "QVG238" is assigned to a GMC Sierra and the registered owner is Ravonia Kay Chisholm[38] of **162 Jenkins Road in Yemassee, South Carolina**. Previous surveillance of CHISHOLM revealed that he and JEFFERSON would meet and based on the arrival of EDWARDS, the interception of TARGET TELEPHONE 11, the previous seizures of drug proceeds from CHISHOLM and the activity and location of

---

38 Ravonia Chisholm is believed to be CHISHOLM's sister that resides in the Jacksonville, FL area. Based on training and experience, I know that drug traffickers register their vehicles in nominee names to hide the asset that the drug trafficker purchased with drug proceeds and/or to deter law enforcement from identifying the drug trafficker is operating the vehicle.



CHISHOLM, I believe that CHISHOLM was likely delivering drug proceeds to JEFFERSON. Later on that night, CHISHOLM was observed exiting his burgundy GMC Sierra at a residence in Moncks Corner, SC that agents believe to be his girlfriend's residence.   CHISHOLM was carrying a black back pack believed to be the same back pack used by CHISHOLM to carry $240,000 in drug proceeds to a courier operating at the direction of ECCLESTON in December 2018. These drug proceeds were then secreted in the back of a suitcase and smuggled to California. Also parked at the residence was a Honda Accord bearing South Carolina license "1692MQ." A query of the South Carolina Department of Motor Vehicles revealed license plate "1692MQ" is assigned to a Honda Accord and the registered owner is Keith CHISHOLM of **162 Jenkins Road in Yemassee, South Carolina**.

109.    On July 11, 2019 surveillance was established at the TownePlace Suites by Marriott in North Charleston, SC. EDWARDS was observed pacing outside of the hotel for extended periods of time, constantly talking on a cellular telephone. On that afternoon, JAMES arrived at the hotel and met with EDWARDS. The two left the hotel in JAMES' silver BMW 745 before returning approximately 1 hour later. At approximately 8:10 p.m., JEFFERSON arrived at the hotel in his blue Chrysler 300 and EDWARDS immediately walked out of the hotel. JEFFERSON was observed delivering a blue roller suitcase to EDWARDS in the parking lot. EDWARDS then took the blue suitcase into the hotel and a few moments later returned to the parking lot to speak with JEFFERSON, who was waiting next to his car. At approximately 8:30 p.m., JEFFERSON departed the hotel and travelled to **10825 Dorchester Road, Summerville, SC**. Surveillance observed JEFFERSON enter **Apartment 2028**.

110.    On July 12, 2019 surveillance at the TownePlace Suites by Marriott again observed EDWARDS pacing outside of the hotel for extended periods of time, constantly talking on a cellular telephone. EDWARDS met with JEFFERSON at approximately 11:35 a.m. and with

89



JAMES at approximately 7:20 p.m. Just before 8:30 p.m., the geo-location of TARGET TELEPHONE 11 and TARGET TELEPHONE 18 indicated that HUBBART departed **234 Miami Street Lot 20, Ladson, SC**. At approximately 8:56 p.m. HUBBART was seen arriving at the hotel in his silver Dodge Durango. Just before HUBBART arrived, EDWARDS departed the hotel lobby with 2 large roller suitcases, one black and one blue. The blue suitcase was the same suitcase that JEFFERSON had delivered to EDWARDS at the hotel the day before. EDWARDS placed the two suitcases into the rear passenger area of HUBBART's SUV and entered the front passenger seat. Surveillance followed HUBBART and EDWARDS as they travelled to the C&W Super Buffet located at 6195 Rivers Avenue in North Charleston, SC. This is a designated pickup location for the GoToBus.com service, the same bus company that EDWARDS used on June 16, 2019 to transport bulk cash drug proceeds to New York. EDWARDS exited HUBBART's SUV and removed the 2 suitcases. HUBBART pulled away and parked nearby but never exited his SUV. EDWARDS then placed both of the suitcases into the rear cargo area of a white, Ford van and entered the passenger area of the van. This van was identified as a shuttle van for the GoToBus.com service to New York. Once the remaining passengers loaded their suitcases and boarded the shuttle van, surveillance was maintained as the shuttle van departed the stop with EDWARDS and the 2 suitcases on board. HUBBART then departed the area as well and returned to his new residence in Ladson, SC. The shuttle van travelled to the next stop located at the Walmart parking lot at 1317 N. Main Street in Summerville, SC. This is also a designated pickup location for the GoToBus.com service. EDWARDS exited the shuttle van to allow additional passengers to board. A short time later the shuttle van departed the Walmart parking lot in Summerville, SC and travelled onto I-26 West. Surveillance of the shuttle van was maintained as it arrived at the McDonalds parking lot located at 6005 W Jim Bilton Blvd in St George, SC at approximately 10:20 p.m. This is the designated location for the GoToBus.com service to transfer the shuttle van passengers onto the



larger buses that travel on I-95 to New York.

111.    Based on the prior interceptions of HUBBART, using TARGET TELEPHONE 11 and EDWARDS, using TARGET TELEPHONE 13, agents had established an interdiction team of uniformed officers at the McDonalds parking lot prior to the arrival of the shuttle van and bus. EDWARDS exited the shuttle van after arriving in the parking lot and began pacing near the shuttle van. At approximately 10:55 the large bus arrived at the McDonalds parking lot and parked behind the shuttle van where EDWARDS was standing. Once the large bus arrived in the parking lot, the passengers in the shuttle van began to prepare to board by retrieving their bags from the rear of the shuttle van. At that time, EDWARDS retrieved the black roller suitcase and walked briskly from the shuttle van into the McDonalds. EDWARDS was observed quickly placing the black suitcase under a table in the McDonalds. EDWARDS then exited the McDonalds and quickly retrieved the blue suitcase from the shuttle van. At that time, uniform law enforcement officers had begun conducting consensual encounters with the bus driver and the passengers placing their bags onto the bus cargo hold below the seats. EDWARDS abruptly threw the blue bag into the cargo area and returned to the sidewalk next the McDonalds. A few moments later, a trained narcotics detection K-9 alerted to the presence of narcotics odor from within the blue bag that EDWARDS placed into the cargo area of the bus. At approximately 11:00 p.m., the manager of the McDonalds began closing the store. EDWARDS did not return inside the McDonalds to retrieve the black bag that he had placed under the bench in the McDonalds. EDWARDS remained outside and began to pace while watching law enforcement conduct their operation. After the McDonalds had closed, investigators retrieved the black suitcase that had been abandoned in the restaurant and placed it with the other luggage on the ground near the cargo area of the bus. A trained narcotics detection K-9 conducting a free air sniff of the last group of bags then alerted to the presence of narcotics odor from within both the blue bag and the black bag, both of which EDWARDS was observed



departing the hotel with. This occurred a short distance away from where EDWARDS was pacing and watching from the sidewalk next to the McDonalds. Because of the positive K-9 alerts, law enforcement asked every passenger on the bus if either of the bags belonged to them. None of the passengers claimed either the black bag or the blue bag. A uniformed law enforcement officer approached EDWARDS and asked if either the black or blue bag belonged to him and if he was a passenger on the bus. EDWARDS did not claim either of the bags and stated that he was not a passenger on the bus. EDWARDS provided a Florida drivers license in the name Renaldo Peters as well as a South Carolina Uniform Traffic Citation issued to the same operator. The Citation listed that Peters (EDWARDS) was speeding in Cottageville, SC on June 4, 2019 while operating a 2013 Honda bearing FL tag "KGBE54." This was the same vehicle EDWARDS was observed operating on June 10 and 11, 2019 when a large amount of drug proceeds was seized from EDWARDS, JEFFERSON and JAMES. There were several other unidentified subjects that had exited the McDonalds once it closed that were still standing by their vehicles. After speaking with law enforcement, EDWARDS walked down and stood by those subjects while using his cellular telephone. By this time, all of the passengers had boarded the bus with the exception of EDWARDS and all of the cargo had been loaded with the exception of the black suitcase and the blue suitcase, which remained on the ground next the bus. Law enforcement officers then retrieved the two suitcases as the bus and the empty shuttle van departed from the parking lot. All of the officers remained in the parking lot for approximately 10 minutes after the bus departed. During this time, EDWARDS walked behind the McDonalds and into the adjacent truck stop / gas station while talking on a cellular telephone. Once law enforcement left the McDonalds parking lot, EDWARDS continued to pace in the area and talk on a cellular telephone. EDWARDS made his way across the street to the Quality Inn located at 6014 W Jim Bilton Blvd in St George, SC.

    112.    Shortly before midnight of July 13, 2019, the geo-location of TARGET



TELEPHONE 11 and TARGET TELEPHONE 18 indicated that HUBBART departed **234 Miami Street Lot 20, Ladson, SC** and was travelling on I-26 West. At approximately 12:34 a.m. on July 13, 2019, HUBBART arrived at the Quality Inn in St George, SC in his silver Dodge Durango. EDWARDS entered the front passenger seat and the two returned to the Charleston, SC area. The geo-location of TARGET TELEPHONE 11, TARGET TELEPHONE 13 and TARGET TELEPHONE 18 indicated that HUBBART and EDWARDS returned to the area of Northside Drive. TARGET TELEPHONE 13 used by EDWARDS remained at the TownePlace Suites by Marriott while TARGET TELEPHONE 11 and TARGET TELEPHONE 18 returned to **234 Miami Street Lot 20, Ladson, SC**.

113.    Early on the morning of July 13, 2019, the geo-location of TARGET TELEPHONE 13 indicated that EDWARDS was located at the Charleston International Airport. Around 9:00 a.m., the geo-location of TARGET TELEPHONE 13 indicated that EDWARDS was located at gate C40 at the Hartsfield Jackson International Airport in Atlanta, GA. Investigators identified that Delta flight DL 1700 departed that gate at approximately 8:58 a.m. for Sacramento, CA. At approximately 10:45 a.m., geo-location of TARGET TELEPHONE 13 indicated that EDWARDS was located at the Sacramento International Airport in Sacramento, CA. The last geo-location of TARGET TELEPHONE 13 indicated that EDWARDS on Highway travelling toward his residence located in Sacramento, CA however TARGET TELEPHONE 13 has not provided a geo-location since that time indicating that EDWARDS discontinued his use of TARGET TELEPHONE 13. Toll analysis identified a new telephone used by EDWARDS that was established on July 13, 2019 with the subscriber listed as "Celvin Bell." Toll analysis of this new telephone used by EDWARDS revealed that EDWARDS is using this new telephone to communicate with HUBBART, JAMES, JEFFERSON, CHISHOLM and FNU LNU a/k/a "Dread."

93



114.    The black suitcase and the blue suitcase were transported to the DEA Charleston office where they have remained in a secure vault. After reviewing the surveillance photographs and videos of EDWARDS, I believe that the black suitcase that was seized is the same suitcase that EDWARDS arrived at the Charleston International Airport with on July 9, 2019. I also believe that the blue suitcase that was seized is the same suitcase that JEFFERSON delivered to EDWARDS on July 11, 2019 at the TownePlace Suites by Marriott in North Charleston, SC. Furthermore, I believe that the black suitcase seized and the blue suitcase seized are the same two suitcases that EDWARDS departed the hotel with on July 12, 2019. I also observed that the blue suitcase appears to be new with marketing stickers still affixed. In addition, the plastic fasteners that are used to hold price tags and merchandise information on a new product are still affixed to the blue suitcase. These findings are consistent with the suitcases used by this organization from which large amounts of drug proceeds were previously seized.

115.    On July 17, 2019 United States Magistrate Judge Bristow Marchant, District of South Carolina authorized a search warrant of the two suitcases. A search of the suitcases resulted in the seizure of $22,970 hidden in the lining of the blue suitcase in the same manner that this DTO has consistently smuggled drug proceeds including those CHISHOLM provided to MASON on December 27, 2018. Inside of the blue suitcase was a large, black toiletries bag that contained 4 plastic bags; a white plastic bag that contained $45,525, a black plastic bag that contained $16,950, a "Foot Locker" brand plastic bag that contained $11,800 and a white plastic bag with a piece of paper attached that had the name "FAM" written on it that contained $29,980. The total amount of drug proceeds seized from EDWARDS' bags was $126,225. Also discovered in EDWARDS' bags were several articles of clothing that he had been observed wearing while in Charleston, SC between July 9 and 13, 2019. Based on intercepted communications, my experience in this case and my training, I believe that the currency was separated based on which member of the DTO;

94



HUBBART, JAMES, JEFFERSON, CHISHOLM or FNU LNU a/k/a "Dread" had provided the drug proceeds to EDWARDS.

## AUTHORIZATION REQUEST

116.    Based on the foregoing, I request that the Court issue the proposed search warrants for the current residences/drug houses including the automobiles and storage buildings located at the current residences/drug houses of HUBBART (**234 Miami Street Lot 20, Ladson, SC**), JAMES (**208 Louie Lane, Ladson, SC**), JEFFERSON (**10825 Dorchester Road Apt 2028, Summerville, SC**), CHISHOLM (**162 Jenkins Road, Yemassee, SC**) and FNU LNU "Dread" (**409 Lafayette Road, Holly Hill, SC**) described in Attachment A for the items listed in Attachment B for **234 Miami Street Lot 20, Ladson, SC**, **208 Louie Lane, Ladson, SC**, **10825 Dorchester Road Apt 2028, Summerville, SC**, **162 Jenkins Road, Yemassee, SC** and **409 Lafayette Road, Holly Hill, SC** and the items listed in Attachment C for **234 Miami Street Lot 20, Ladson, SC** and **409 Lafayette Road, Holly Hill, SC**.

## CONCLUSION

117.    I know that HUBBART, JAMES, JEFFERSON, CHISHOLM and FNU LNU a/k/a "Dread" are drug traffickers and they maintain residences located at the aforementioned addresses. I know that drug traffickers keep drugs, drug scales, and drug proceeds at their respective residences/businesses along with the items described in Attachment B and actively use their residences/businesses as a place to conduct drug transactions or to store drugs and or firearms. Based on this information, I have reason to believe that HUBBART, JAMES, JEFFERSON, CHISHOLM and FNU LNU a/k/a "Dread" and others known and unknown, have used, and continue to use, the above listed addresses to commit violations of federal laws, specifically Title 21, United States Code, Section 841(a)(1) and Title 21, United States Code, Section 846. These violations include the unlawful possession of, possession with intent to distribute, the distribution



of controlled substances, and conspiracies and attempts to do the same, in violation of Title 21, United States Code, Section 841(a)(1) and Title 21 United States Code 846. I believe those items listed in Attachment B, to include drug ledgers, cellular phones, phone records, and records pertaining to this conspiracy, and/or U.S. currency will be located at **234 Miami Street Lot 20, Ladson, SC**, **208 Louie Lane, Ladson, SC, 10825 Dorchester Road Apt 2028, Summerville, SC, 162 Jenkins Road, Yemassee, SC** and **409 Lafayette Road, Holly Hill, SC** and described in Attachment A. I also believe those items listed in Attachment C, to include firearms and ammunition, as well as papers, documents, records and/or receipts pertaining to the possession or ownership of firearms and ammunition will be located at **234 Miami Street Lot 20, Ladson, SC** and **409 Lafayette Road, Holly Hill, SC** described in Attachment A.

AUSA Jamie Schoen has reviewed this affidavit.

Respectfully submitted,

Brian Robinson
Special Agent

Subscribed and sworn to before me on July 2³, 2019

BRISTOW MARCHANT
UNITED STATES MAGISTRATE JUDGE

96

